IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GENE SCHAERR,  )<br><br>            Plaintiff,  )<br><br>       v.  )<br><br>UNITED STATES DEPARTMENT  )<br>OF JUSTICE, *et al.*,  )<br><br>            Defendants.  ) | Case No. 1:18-cv-575-ABJ |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    I.    DEFENDANTS' RATIONALE FOR THEIR GLOMAR RESPONSES IS
        LOGICAL OR PLAUSIBLE. ..................................................................................... 2

    II.   PLAINTIFF'S ARGUMENTS ABOUT BAD FAITH AND OFFICIAL
        ACKNOWLEDGMENT FAIL TO VITIATE DEFENDANTS' GLOMAR
        RESPONSES. ............................................................................................................... 8

    III.  DEFENDANTS' SEARCHES WERE ADEQUATE ................................................ 17

    IV.  PLAINTIFF DOES NOT CHALLENGE ANY OF DEFENDANTS'
        WITHHOLDINGS OF INFORMATION UNDER FOIA EXEMPTIONS ............... 23

CONCLUSION....................................................................................................................... 24

## TABLE OF AUTHORITIES

### CASES

*Accuracy in Media, Inc. v. National Transp. Safety Bd.*,
  2006 WL 826070 (D.D.C. Mar. 29, 2006) ............................................................ 10

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013) ............................................................................ 11

*ACLU v. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011) ........................................................................ 12, 13

*ACLU v. DOJ*,
  655 F.3d 1 (D.C. Cir. 2011) ................................................................................. 8

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983) ...................................................................... 12, 14

*Agility Public Warehousing Co. K.S.C. v. NSA*,
  113 F. Supp. 3d 313 (D.D.C. 2015) ..................................................................... 13

*Baker & Hostetler LLP v. Dep't of Commerce*,
  473 F.3d 312 (D.C. Cir. 2006) .............................................................................. 9

*Coleman v. DEA*,
  134 F. Supp. 3d 294 (D.D.C. 2015) ..................................................................... 18

*Competitive Enter. Inst. v. NSA*,
  78 F. Supp. 3d 45 (D.D.C. 2015) ............................................................ 12, 13, 15, 16

*Competitive Enterprise Institute v. Office of Science and Technology Policy*,
  241 F. Supp. 3d 14 (D.D.C. 2017) ....................................................................... 22

*Dep't of State v. Ray*,
  502 U.S. 164 (1991) ........................................................................................... 9

*EPIC v. NSA*,
  678 F.3d 926 (D.C. Cir. 2012) ............................................................................ 15

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) .................................................................... 11, 12, 13

*Iturralde v. Comptroller of the Currency*,
  315 F.3d 311 (D.C. Cir. 2003) ............................................................................ 17

*James Madison Project v. DOJ*,
  302 F. Supp. 3d 12 (D.D.C. 2018),
  *reconsideration denied in part*, 320 F. Supp. 3d 143 (D.D.C. 2018)..............................9, 14, 16

*James Madison Project v. DOJ*,
  330 F. Supp. 3d 192 (D.D.C. 2018) ..................................................4, 11, 12, 14, 16

*Jones v. FBI*,
  41 F.3d 238 (6th Cir. 1994)................................................................. 10

*Judicial Watch v. State*,
  235 F. Supp. 3d 310 (D.D.C. 2017) ...................................................... 11

*Larson v. State*,
  565 F.3d 857 (D.C. Cir. 2009) ............................................................ 10

*Meeropol v. Meese*,
  790 F.2d 942 (D.C. Cir. 1986) ............................................................ 17

*Mobley v. CIA*,
  806 F.3d 568 (D.C. Cir. 2015) ....................................................... 11, 14

*Moore v. CIA*,
  666 F.3d 1330 (D.C. Cir. 2011) ...................................................... 12, 13

*Parker v. DOJ*,
  214 F. Supp. 3d 79 (D.D.C. 2016) ....................................................... 10

*Pinson v. United States Dep't of Justice*,
  243 F. Supp. 3d 74 (D.D.C. 2017) ....................................................... 23

*Poulsen v. Dep't of Def.*,
  373 F. Supp. 3d 1249 (N.D. Cal. 2019) ............................................... 4, 16

*Pub. Citizen v. Dep't of State*,
  11 F.3d 198 (D.C. Cir. 1993) ............................................................. 12

*SafeCard Servs., Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ............................................. 9, 18, 19, 20

*Salisbury v. United States*,
  690 F.2d 966 (D.C. Cir. 1982) ............................................................ 13

*Schrecker v. DOJ*,
  349 F.3d 657 (D.C. Cir. 2003) ............................................................ 11

*Schwarz v. Dep't of Treasury*,
   131 F. Supp. 2d 142 (D.D.C. 2000) ........................................................................................ 4

*Steinberg v. DOJ*,
   23 F.3d 548 (D.C. Cir. 1994) ................................................................................................ 17

*Wikimedia Foundation v. NSA*,
   335 F. Supp. 3d 772 (D. Md. 2018) ........................................................................................ 4

*Wilbur v. CIA*,
   355 F.3d 675 (D.C. Cir. 2004) .............................................................................................. 17

*Winston & Strawn, LLP v. McLean*,
   843 F.3d 503 (D.C. Cir. 2016) .............................................................................................. 23

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ........................................................................................ 11, 12

**STATUTES**

50 U.S.C. § 1881f ........................................................................................................................ 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GENE SCHAERR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 1:18-cv-575-ABJ |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF JUSTICE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this FOIA case, Plaintiff requested sensitive national security information relating to the agencies' "unmasking" policies and procedures, the "unmasking" of particular named individuals during a particular time frame, and the "upstreaming" of particular named individuals during a particular time frame. Plaintiff's FOIA requests regarding "unmasking" implicate intelligence community agencies' possession and dissemination of Foreign Intelligence Surveillance Act ("FISA")-derived intelligence information on specific individuals, as well as whether the agencies "unmasked," or were asked to "unmask," the individuals' identities. Plaintiff's FOIA requests regarding "upstreaming" seek information about whether the agencies maintain any information referring to the named individuals obtained as a result of the "upstream" collection of intelligence information under the FISA, an intelligence method.

In opposing the defendant agencies' motion for summary judgment, Plaintiff takes issue

with the limited nature of the agencies' responses to Plaintiff's requests, but those responses are

a function of the highly sensitive nature of the information sought, including whether responsive

records even exist.  Plaintiff opposes the agencies' Glomar assertions mainly on the grounds that

the agencies acted in bad faith and that they officially acknowledged the existence of responsive

records, thereby waiving their Glomar assertions.  As to the claim of bad faith, Plaintiff relies on

allegations about improper or illegal unmasking of individuals for political purposes, rather than

any improper conduct by the agencies in responding to his FOIA request.  But this is insufficient

to overcome a Glomar assertion.  Plaintiff's official acknowledgment argument, largely based on

statements by officials outside the executive branch or statements by officials within the

executive branch that are not sufficiently specific, also fails.

As to the parts of the request that the agencies were able to process because they sought

policy-type documents, Plaintiff challenges the adequacy of the agencies' searches but not any of

their withholdings.  Plaintiff claims that the agencies conducted inadequate searches principally

because they did not produce certain documents that Plaintiff speculates are responsive to his

request.  However, as is well-established in the D.C. Circuit, a search should be judged by its

methods, not its fruits.  The defendant agencies have put forth detailed declarations establishing

the adequacy of their searches, which are not undermined by Plaintiff's speculation.  The Court

should therefore grant summary judgment in the agencies' favor.

## ARGUMENT

## I.     DEFENDANTS' RATIONALE FOR THEIR GLOMAR RESPONSES IS LOGICAL OR PLAUSIBLE.

Plaintiff's FOIA request to the FBI,[1] CIA, NSA, NSD, State, and ODNI was for all

---

[1] Plaintiff asserts in his Cross Motion for Summary Judgment, at 17 n. 2, as well as in his Statement of Undisputed Facts ¶ 49, that he timely appealed all of the agencies' responses to his FOIA requests.  Defendants argued in their opening brief that Plaintiff failed to exhaust his

records concerning the unmasking, or any request for unmasking, or the upstreaming, of 21

specific Trump transition officials, who are presumably U.S. persons, from January 1, 2015 to

February 1, 2017.  Unmasking and upstreaming in the context of Plaintiff's requests relate to the

collection and dissemination of foreign intelligence information pursuant to Section 702 of the

Foreign Intelligence Surveillance Act ("FISA").  Information collected under intelligence

authorities, including under FISA Section 702, is classified in order to protect intelligence

sources, methods, and activities, and to protect the United States from damage to national

security.  *Id*. at 12; Hardy Decl. ¶ 35; Gaviria Decl. ¶ 40.

Agencies may disseminate information obtained pursuant to Section 702 to authorized

recipients.  When they do, minimization procedures promulgated under FISA generally require

that the agencies protect and not disseminate the identities of unconsenting U.S. persons included

in an intelligence report, which can be done through "masking."  Section 702 prohibits agencies

from targeting a U.S. person anywhere in the world, but non-targeted U.S. person information

may be incidentally collected when, for example, a target communicates with or about a non-

target U.S. person.  The masking of U.S. identities when intelligence is disseminated, as required

by FISA, protects U.S. person information that has been incidentally collected.  ODNI,

Protecting U.S. Person Identities in Disseminations under the FISA,[2] at 4, 7.  However, in

general, certain U.S. government officials may ask that masked U.S. person information be

---

administrative remedies as to FBI's Glomar assertions pursuant to Exemptions 1 and 3.  Defs.
opening brief at 13 n.1.  However, Plaintiff is indeed correct that the decision that he appealed on
April 27, 2018 (after the filing of the complaint), Hardy Decl. Exh. L, only applied to FBI's
Glomar response pursuant to Exemptions 1 and 3 for the request related specifically to the
individual for whom he submitted a privacy waiver.  Defendants therefore agree that their
exhaustion argument is limited to this portion of Plaintiff's FOIA request.
[2] "Protecting U.S. Person Identities in Disseminations under the Foreign Intelligence
Surveillance Act,"*available at* https://www.dni.gov/files/documents/icotr/CLPT-USP-
Dissemination-Paper---FINAL-clean-11.17.17.pdf (last accessed August 23, 2019).

revealed, or "unmasked," when revealing the U.S. person's identity is necessary to the dissemination of needed intelligence to protect national security.  Hardy Decl. ¶ 11.  *See also* Stein Decl. ¶ 33 (explaining that a recipient of FISA-derived intelligence reports may ask that masked U.S. person information be revealed when necessary to the recipient's understanding and use of the intelligence report in the course of official duties).

Thus, as explained in Defendants' opening brief and declarations, confirming that there are records about the unmasking, a request to unmask, or the upstreaming of the 21 identified U.S. persons listed in Plaintiff's FOIA request would necessarily confirm, at a minimum, that information about those persons was collected pursuant to FISA and appears in FISA-derived intelligence reports.  *See, e.g.*, Findlay Decl. ¶ 10 & n.4 ("If an individual were the subject of an unmasking request within the context plaintiff laid out in his request, that individual necessarily appears in some collection captured by electronic surveillance under FISA.");  *id.* ¶ 13.  That is a classified fact, which reveals intelligence sources and methods.  *Id.* ¶ 13.  Its disclosure could cause harm to national security because it would provide non-public information to our adversaries about who is subject to a particular form of intelligence collection (FISA Section 702 collection) – i.e., non-public information about the intelligence community's activities and methods, with respect to particular individuals at particular times.  Findlay Decl. ¶ 14; Hardy Decl. ¶ 44  Courts routinely uphold Glomar assertions when confirming the existence or nonexistence of records would reveal whether FISA surveillance was used against a particular individual at a particular time, under the various exemptions Defendants asserted here.  *Poulsen v. Dep't of Def.*, 373 F. Supp. 3d 1249, 1277 (N.D. Cal. 2019); *James Madison Project v. DOJ*, 330 F. Supp. 3d 192, 216 (D.D.C. 2018); *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 142, 149–50 (D.D.C. 2000); *Cf. Wikimedia Foundation v. NSA*, 335 F. Supp. 3d 772, 788-89 (D. Md.

2018) (holding that likely danger that disclosure of, *inter alia*, information identifying entities subject to Upstream surveillance activities would harm national security meant that information was protected by the state secrets privilege from disclosure in discovery in civil suit; rejecting argument that the plaintiff's communications were so ubiquitous that to reveal surveillance of its communications would not provide information about specific targets of Upstream collection).

The FBI further explains in a supplemental declaration that Plaintiff's FOIA request "seeks sensitive intelligence information about a small, unique group of individuals. If the FBI acknowledged that it had records responsive to Plaintiff's request, even if the revelation simply were that information about the listed individuals was incidentally collected, this would provide valuable information to foreign intelligence officers, hostile foreign entities, and other adversaries about whether or not their communications are subject to surveillance." Second Declaration of David M. Hardy ("Sec. Hardy Decl.") ¶ 6. The FBI elaborates that "[t]hese adversaries know whether or not they have communicated with or discussed anyone on Plaintiff's list or whether they have discussed anyone on Plaintiff's list. Assuming, for the sake of argument, that one of the listed individuals has been in contact with such an adversary (e.g., the target of surveillance), disclosing the existence of records would inform the adversary of the fact that they are the subject of surveillance." *Id.* The FBI logically and plausibly concludes that "[d]isclosing that there has been incidental collection involving a small, unique group of individuals will help adversaries narrow down the potential targets of intelligence collection by the United States to facilitate a more accurate assessment and identification of the actual intelligence target." *Id.*[3]

---

[3] The FBI supplemental declaration also expounds on why it cannot confirm the *non-existence* of responsive records for the parts of the request that it asserted a Glomar response: "Finally, even the absence of responsive records poses risks to national security. Revealing that there are no responsive records would indicate that the USIC [U.S. Intelligence Community] is *not* looking in

To use an example from Plaintiff's list of 21 individuals, a hypothetical revelation that information about Steve Bannon was incidentally collected pursuant to Section 702 (or even more specifically, was collected via the upstreaming methodology), would tell individuals who were communicating with or about Steve Bannon that they may have been targeted for surveillance under Section 702.  That is highly useful information that those individuals can use, alone or in conjunction with other information, to evade surveillance in the future, to the detriment of national security.  *See* Hardy Decl. ¶ 43-44; Sec. Hardy  Decl. ¶ 6; Shiner Decl. ¶ 31-32; Stein Decl. ¶¶ 34-35; Gaviria Decl. ¶¶ 43-44; Thompson Decl. ¶ 40; Findlay Decl. ¶ 14; Kiyosaki Decl. ¶ 5.

But there is more.  Not only would confirming the existence or nonexistence of records about the unmasking of any of the 21 named individuals confirm whether information about them appears in FISA-derived intelligence reports, it would reveal information about the significance of that information, including whether a U.S. government official believed that unmasking one of those individual's identities was necessary to understand intelligence necessary to protect national security.  Sec. Hardy Decl. ¶ 7 (confirming the existence of records "would reveal that intelligence involving the target and the U.S. Person was significant enough to warrant dissemination and also that a U.S. government official believed that unmasking the identity of one or more of the named individuals was necessary and warranted.").

Plaintiff's opposition fails to challenge Defendants' rationale for their Glomar responses, which is logical or plausible.  *See* Defs.' Mot. for Summ. Judgment, ECF No. 18 ("Defs.' opening brief"), at 11 (the government can establish the appropriateness of a Glomar response by demonstrating that it is logical or plausible).  Plaintiff argues through various hypotheticals that

---

a particular direction, which is information that adversaries could use in trying to understand where the USIC is looking and who it is targeting."  Sec. Hardy  Decl. ¶ 9 (emphasis in original).

merely acknowledging that there are or are not records about the unmasking of the named

individuals does not compromise intelligence sources, methods, or national security, but he does

not explain why that is so or engage with Defendants' rationale.  *See* Pl.'s Cross-Mot. for Summ.

Judgment and Opp'n to Mot. for Summ. Judgment, ECF No. 24 ("Pl.'s brief"), at 2, 21, 25-26.

Plaintiff concedes that his list of transition team individuals is "a limited group," *id.* at 22, which

supports Defendants' rationale for why a Glomar assertion is appropriate here.  To the extent that

Plaintiff's theory is that *he* would infer from a response confirming the existence of responsive

records that an unmasking request was made for an *improper* purpose, and that would not harm

national security, that cannot undermine Defendants' determination about what our *adversaries*

would infer from such a response – that is, the existence of a *proper* unmasking request, and all

that that conveys.  That determination, which is the basis for Defendants' Glomar assertions

pursuant to Exemptions 1 and 3, is entitled to substantial weight, and is logical or plausible,

especially in light of the presumption that government officials follow the law.[4]

For many of these same reasons, the FBI also properly relied on Exemptions 6, 7(C), and

7(E) for their Glomar response.  *See* Defs.' opening brief at 20-22.  Other than a passing

reference to the FBI's Exemption 7(E) Glomar assertion, Pl.'s brief at 16, Plaintiff provides no

rebuttal to that assertion.  For Exemptions 6 and 7(C), the agencies found that the strong privacy

interest the identified individuals have in not being publicly connected with high-profile,

sensitive law enforcement investigations, either as a target or third party, outweighs Plaintiff's

asserted public interest in disclosure of this information.  Defs.' opening brief at 21-22.

Plaintiff's solution of redacting the individuals' names from the records does not protect the

---

[4] Exemption 3 does not require a showing of harm but rather only that the agency show that the information is protected from disclosure by statute, which the agencies that asserted a Glomar response pursuant to Exemption 3 did.  *See* Def.'s opening brief at 18-20.

privacy of the named individuals because of the "small, unique group of individuals" named in
the request.  *See* Sec. Hardy  Decl. ¶ 6.  Nor would a mere response that records exist contribute
to Plaintiff's primary asserted public interest in disclosure, because it would not necessarily
mean that any unmasking, or request to unmask, was done for an improper purpose, as explained
above.  *See* Pl.'s brief at 24 ("the public has a strong interest in knowing whether and to what
extent the FBI and other agencies engaged in politically motivated targeting of a major-party
presidential candidate.").[5]

Plaintiff's secondary asserted public interest in disclosure, "the more general public
interests [sic] in warrantless surveillance," relies on a D.C. Circuit decision finding the use and
justification for warrantless cell phone tracking to be a topic of considerable public interest in
2011.  *Id*. at 16-17 (citing *ACLU v. DOJ*, 655 F.3d 1, 12-13 (D.C. Cir. 2011).  The court
elaborated that "[c]ourts are divided as to whether the government must show probable cause
before it can obtain cell phone location data, as well as on related questions regarding
warrantless GPS surveillance."  Warrantless cell phone tracking is, however, different from
foreign intelligence surveillance authorized by Section 702 of FISA at issue in Plaintiff's FOIA
request.  Moreover, the public interest in something in 2011 is not relevant to the public interest
today.

## II.     PLAINTIFF'S ARGUMENTS ABOUT BAD FAITH AND OFFICIAL ACKNOWLEDGMENT FAIL TO VITIATE DEFENDANTS' GLOMAR RESPONSES.

Rather than meaningfully challenge the rationale behind Defendants' Glomar assertions,

---

[5] Plaintiff's argument about the strong public interest supporting disclosure of the requested records, although framed as an overarching challenge to all the defendant agencies' Glomar responses, is pertinent only to the FBI's assertion of Exemptions 6 and 7(C) to support its Glomar response, because the public interest in disclosure is not a factor in the Exemptions 1, 3, or 7(E) analysis.  *See* Pl.'s brief at 14-16; Defs.' opening brief at 13-23.

Plaintiff primarily attacks them by arguing bad faith and, secondarily, official acknowledgment. First, he claims that evidence of bad faith can overcome a Glomar assertion, and argues that he has presented such evidence by pointing to evidence of unmasking and upstream surveillance for political purposes, as opposed to national security purposes. Pl.'s brief at 18-22. Second, Plaintiff argues that the government's Glomar assertions are undone by its official acknowledgments. *Id*. at 27-32. Neither theory carries the day.

Generally speaking, in FOIA as elsewhere, there is a presumption of good faith and regularity in official conduct. *Dep't of State v. Ray*, 502 U.S. 164, 179 (1991) ("We generally accord Government records and official conduct a presumption of legitimacy."); *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (finding that allegations of misconduct were insufficient to defeat summary judgment); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (holding that agency search affidavits "are accorded a presumption of good faith . . . ."); *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 32 (D.D.C.), *reconsideration denied in part*, 320 F. Supp. 3d 143 (D.D.C. 2018) ("Applying the presumption is most appropriate where a government official or entity conducts official acts in the manner provided by statute, regulation, or policy. For example, agencies are presumed to comply with their FOIA obligation to disclose reasonably segregable material, and to properly produce and process government documents . . . .").

Against this well-established principle, Plaintiff contends that purported evidence about illegal unmasking of Trump transition team officials makes the agencies' Glomar responses to his FOIA requests inappropriate because, he claims, "[w]hen a government agency commits misconduct, documents regarding that misconduct are typically acknowledged and produced." Pl.'s brief at 18. Of the cases Plaintiff cites in support of this proposition, only one is a Glomar

case. *Id*. at 18-19.  In that case, DOJ withdrew its Glomar response to a FOIA request seeking

records about any investigation into the unauthorized practice of law by a particular Assistant

U.S. Attorney, not because of the underlying allegation of misconduct by the AUSA but rather

because DOJ had previously acknowledged an investigation into the AUSA.  *Parker v. DOJ*, 214

F. Supp. 3d 79, 83 (D.D.C. 2016).  Thus, confirming the existence of responsive records would

no longer give away the secret of the investigation.

Plaintiff's other cases are even more inapposite.  He highlights *Jones v. FBI*, 41 F.3d 238,

243 (6th Cir. 1994), a challenge to an agency's withholding of information pursuant to

exemptions (as opposed to a Glomar response).  In that context, the Sixth Circuit stated that the

presumption of good faith for agency declarations in FOIA cases may be overcome by evidence

of bad faith in the agency's handling of the FOIA action itself, as well as "evidence of bad faith

or illegality with regard to the underlying activities which generated the documents at issue," and

held that the district court should have conducted *in camera* review of the records.  But a D.C.

Circuit case that Plaintiff also cites, *Larson v. State*, 565 F.3d 857 (D.C. Cir. 2009), explains that

the evidence of bad faith has to be in the agency's handling of the FOIA request.  565 F.3d at

864 (granting the CIA's affidavit substantial weight concerning the classified nature of the State

Department cables at issue, noting that the parties presented no "evidence suggesting bad faith

on the part of the CIA in withholding the cables").  *See also Accuracy in Media, Inc. v. National

Transp. Safety Bd.*, 2006 WL 826070, at * 8-10 (D.D.C. Mar. 29, 2006) (in challenge to the

adequacy of an agency's search for records about NTSB investigation into crash of TWA Flight

800 based on the plaintiff's theories about agency bad faith in the underlying investigation,

distinguishing *Jones* as being a challenge to exemptions, and noting that the plaintiff failed to

present any evidence that the search was conducted in bad faith or was designed to cover up the

investigation's alleged deficiencies).[6]

Plaintiff's allegations of bad faith center on the alleged underlying surveillance and unmasking, not the agencies' processing of his FOIA requests.  *See* Pl.'s brief at 18-22.  To the extent that Plaintiff challenges the agencies' Glomar responses as being asserted in bad faith, *id.* at 20, those arguments merge with his arguments on the merits of the Glomar responses.  *See* section I, *infra*.  The Court should therefore reject Plaintiff's attempt to pierce the agencies' Glomar responses based on agency bad faith.

Plaintiff's official acknowledgment argument suffers the same fate.  As a general matter, "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).  This "official acknowledgment" principle applies to the Glomar context, so a FOIA requester "can overcome a Glomar response by showing that the agency has already disclosed the fact of the existence (or non-existence) of responsive records, since that is the purportedly exempt information that a Glomar response is designed to protect." *Id.* at 427.  The plaintiff "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).

The D.C. Circuit has narrowly construed the "official acknowledgment" doctrine. A plaintiff must satisfy three stringent criteria, none of which is satisfied here.  *Fitzgibbon v. CIA*, 911 F.2d 755, 765–66 (D.C. Cir. 1990); *see also Mobley v. CIA*, 806 F.3d 568, 583–84

---

[6] *Judicial Watch v. State*, 235 F. Supp. 3d 310, 313-14 (D.D.C. 2017), also cited by Plaintiff, involved the narrow government-misconduct exception to Exemption 5's deliberative process privilege, which is not at issue here.  *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003), concerned withholding information identifying private citizens mentioned in law enforcement records under Exemption 7(C), not a Glomar response.

(D.C. Cir. 2015); *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). "First, the information requested must be as specific as the information previously released." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765); *James Madison Project v. DOJ*, 330 F. Supp. 3d 192, 204 (D.D.C. 2018). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure. This insistence on exactitude [by the D.C. Circuit] recognizes 'the Government's vital interest in information relating to national security and foreign affairs." *Id.* (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)); *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 54 (D.D.C. 2015) ("Plaintiffs in this case must therefore point to specific information in the public domain establishing that the NSA has [the claimed information.]"). The information already released must also be of the same level of generality as the information sought—broadly crafted disclosures, even on the same general topic, do not waive the Glomar response. *See, e.g.*, *Afshar v. Dep't of State*, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (previous disclosure that plaintiff had "'created a problem' in U.S.-Iranian relations" was too general to justify releasing documents detailing the nature of that problem).

"Second, the information requested must match the information previously disclosed." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). If there are "substantive differences" between the two, an official-acknowledgment claim must fail. *ACLU v. Dep't of Def.*, 628 F.3d 612, 621 (D.C. Cir. 2011). That is true even if the previous disclosures are on the same topic. *See, e.g.*, *Competitive Enter. Inst.*, 78 F. Supp. 3d at 57 (a Presidential statement that "the intelligence community . . . is looking at phone numbers and durations of calls," was not adequately congruent with a request seeking the companies that had provided that data to U.S. intelligence agencies); *Wolf*, 473 F.3d at 379 (holding that CIA could not claim Glomar

protection when it had previously read excerpts from materials sought into the record during congressional hearing).

"Third, . . . the information requested must already have been made public through an official and documented disclosure." *Id.* at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  Key to this element is that the source must be *official*; non-governmental releases, or anonymous leaks by government officials or former government officials do not qualify.  *See, e.g.*, *ACLU v. Dep't of Defense*, 628 F.3d at 621-22; *Agility Public Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 330 n.8 (D.D.C. 2015); *Competitive Enter. Inst.*, 78 F. Supp. 3d at 55.  Nor can members of Congress waive Executive Branch classification or other exemptions.  *James Madison Project v. Dep't of Justice*, 330 F. Supp. 3d 192, 213 (D.D.C. 2018) (ABJ) ("Members of Congress cannot officially disclose the existence of records on behalf of DOJ because members of a separate branch of government . . . do not speak for an executive agency"); *cf. Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) ("[B]are discussions by this court and the Congress of NSA's methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering."); *Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought.").

Plaintiff points to several public statements that he claims constitute official acknowledgments of the existence of the records he seeks about specific individuals.  Pl.'s brief at 27-32.  However, Plaintiff has pointed to no statement made by a current official of the Executive Branch that publicly and officially acknowledges the existence or non-existence of records relating to the unmasking or upstreaming of any of the 21 individuals named in Plaintiff's FOIA request.  Rather, Plaintiff relies upon statements of officials from other branches

of government, former government officials, and the news media, none of which qualify as official acknowledgments, or statements of current Executive Branch officials that do not match the information Plaintiff seeks in his request.

First, Plaintiff relies on statements made by officials from the legislative branch. These statements include those made by House Representative Devin Nunes, Pl.'s brief at 9-10, Pl.'s Statement of Undisputed Facts, ECF No. 24-7 ("Pl. SUF"), ¶¶ 7, 15, 16, 20; an "unnamed Senator," Pl. SUF ¶16; as well as the House Committee on Ethics, Pl. SUF ¶ 18. However, members of the legislative branch cannot make official acknowledgments that overcome the Glomar assertions of Executive Branch agencies. *James Madison Project v. Dep't of Justice*, 330 F. Supp. 3d 192, 213 (D.D.C. 2018) (ABJ) ("Members of Congress cannot officially disclose the existence of records on behalf of DOJ because members of a separate branch of government . . . do not speak for an executive agency").

Second, Plaintiff cites to several statements made by former government officials. These include statements by former Attorney General Yates and former Director of National Intelligence Clapper. Pl.'s brief at 14, Pl. SUF ¶ 14. But statements made by former government officials do not count as official acknowledgments. *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1133–34 (D.C. Cir. 1983) (holding that disclosures contained in books authored by former CIA agents and officials—screened and approved by the CIA—are not "tantamount to official executive acknowledgments"); *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 27 (D.D.C. 2018) *citing Mobley*, 806 F.3d at 583.

Finally, Plaintiff cites to several news reports either directly, Pl. SUF ¶ 19-29, or as discussed by government officials, Pl. SUF ¶ 8, 9, 12. For example, Plaintiff relies on media reports about former U.N. Ambassador Samantha Power and former national security adviser

Susan Rice, but no actual statements by those two officials while they were employed by the

Executive Branch.  Pl.'s brief at 10, 12, 14, 19; Pl. SUF ¶ 19-27.  Statements by the media,

however, do not constitute official acknowledgments either.  *EPIC v. NSA*, 678 F.3d 926, 933 n.5

(D.C. Cir. 2012) ("NSA has never officially acknowledged a collaborative relationship with

Google, and the national media are not capable of waiving NSA's statutory authority to protect

information related to its functions and activities."); *Competitive Enter. Inst. v. NSA*, 78 F. Supp.

3d 45, 59 (D.D.C. 2015) ("But speculation by the press—no matter how widespread—and

disclosures in the press from unnamed sources are not sufficient to waive an agency's right to

withhold information under FOIA.").

 In contrast, a statement by the President, the President's Press Secretary, or the current

Attorney General (when DOJ is a defendant agency) may qualify as an official acknowledgment,

but it must, in the Glomar context, disclose the existence of the specific documents sought in the

FOIA request.  Plaintiff fails to point to any such statement.  As noted, Plaintiff seeks three

categories of information for which the defendant agencies asserted a Glomar response: (1)

documents concerning the unmasking, or any request for unmasking, of 21 specific Trump

transition officials from January 1, 2015 through February 1, 2017; (2) documents concerning

the upstreaming of 21 specific Trump transition officials from January 1, 2015 through February

1, 2017; and (3) reports made to S12 and SV regarding improper dissemination of the 21 Trump

transition officials (NSA only).

 Plaintiff first points to White House Press Secretary Sarah Sanders' statement that

"[w]e've seen illegal leaking of classified materials, including the identities of American citizens

unmasked in intelligence reports.  That's why the President called for Congress to investigate

this matter and why the Department of Justice and Intelligence Community are doing all they can

to stamp out this dangerous trend that undermines our national security."  Pl.'s brief at 29; Pl.'s

SUF ¶ 11.  But a reference to "American citizens" is in no way a match to any of the 21

individuals named in Plaintiff's FOIA request, nor is there anything in this statement that

matches the time frame specified in the request.  *See Poulsen v. Dep't of Defense*, 373 F. Supp.

3d 1249, 1272 (N.D. Cal. 2019) ("the President's very general tweets and comments do not

disclose the existence of the specific documents sought in Poulsen's Requests.  There is no

disclosure establishing that any of the specific documents sought by Poulsen *exists*, much less a

match between the disclosures and the specific electronic surveillance information sought by

Poulsen."); *Competitive Enter. Inst.*, 78 F. Supp. 3d at 57.

Plaintiff next refers to a series of press statements and tweets by President Trump, but

none of those rise to the level of an official acknowledgment that any of the defendant agencies

have responsive records.  In those statements that mention unmasking, the President is merely

commenting on news reporting.  Pl.'s SUF ¶¶ 8, 9, 12.  For example, in the President's statement

about Susan Rice that Plaintiff highlights, the source of the President's information is a report of

an admission by Susan Rice, a former government official, not any information he received from

the defendant agencies.  Pl.'s brief at 30, Pl.'s SUF ¶ 12 ("I heard she admitted that yesterday.").

Thus "none of the [statements or] tweets inescapably lead to the inference that the President's

statements . . . are rooted in information he received from the law enforcement and intelligence

communities," and do not vitiate the agencies' Glomar responses.  *James Madison Project*, 302

F. Supp. 3d at 33 (President's tweets that reference ongoing news events, as opposed to

information that only could be obtained from government records, did not constitute official

acknowledgment of the existence of requested records); *see also James Madison Project v. DOJ*,

330 F. Supp. 3d 192, 211 (D.D.C. 2018) (President's retweet of media speculation could not be

read as disclosing the existence of responsive records).[7]

## III.    DEFENDANTS' SEARCHES WERE ADEQUATE

Defendants' opening brief established that the defendant agencies conducted adequate searches for records responsive to Parts 1 and 4 (for ODNI and NSD) of Plaintiff's FOIA requests because they searched all locations reasonably likely to have responsive records.  Defs.' opening brief at 23-32.  Plaintiff's primary argument in opposition is that the searches were inadequate because the agencies did not find a laundry list of documents Plaintiff claims, without providing any supporting evidence, are responsive.  Pl.'s brief at 32-37.  It is well-established, however, that the adequacy of the search is judged by its methods, not its fruits.  *See, e.g.*, *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) ("the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records.");

*Iturralde v.Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.") (citing *Steinberg*, 23 F.3d at 551);

*Meeropol v. Meese*, 790 F.2d 942, 952-53 (D.C. Cir. 1986) (search is not presumed unreasonable simply because it fails to produce all relevant material).  In other words, "[w]hen a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the

---

[7] Plaintiff cites to a letter by Deidre Walsh, Director of Legislative Affairs for ODNI, attached to his brief as an exhibit, which states that "[b]ased on a search of ODNI records," ODNI has provided three congressional notifications pursuant to its procedures to notify Congress about disseminated congressional identity information.  Pl.'s brief Exh. C; Pl. SUF ¶ 16.  The letter states that the three notifications concern "the dissemination of [redacted] name or identifying particulars, such as an email address, in intelligence reporting" and that the notifications were made in 2012 and 2013.  Not only does this statement not satisfy the matching requirement because the pertinent name is redacted, but it precedes the Jan. 1, 2015-Feb. 1, 2017 time frame of Plaintiff's request.  Other statements of government officials Plaintiff relies upon do not even mention unmasking or upstreaming.  *See, e.g.*, Pl. SUF ¶ 17.

factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Services*, 926 F.2d at 1201.[8]

Accordingly, the agency's burden is to show that it searched for responsive records in all locations that they are reasonably likely to be found, not to explain why some 40-odd documents Plaintiff claims are responsive were not found.  Nonetheless, we briefly address here the handful of documents Plaintiff highlights in his brief.  Plaintiff first references ODNI's 14th Joint Assessment, which states that the "FBI has established internal compliance mechanisms and procedures to oversee proper implementation of its Section 702 authorities."  Pl.'s brief at 33, citing Pl.'s Exh. B at 3, which cites the 14th Joint Assessment at page 12.  But that describes the FBI's Foreign Intelligence Surveillance Act and Standard Minimization Procedures Policy Guide, which the FBI determined contained information about FBI policy and guidance on unmasking, and which the FBI produced to Plaintiff.  Hardy Decl. ¶¶ 83-84; Sec. Hardy  Decl. ¶ 12 & n.3.

Plaintiff next references the Identity Release Request Form, which he claims is referenced in Subsection 7.1 of the NSA's Identities of SIGINT Manual.  Pl.'s brief at 33, citing Pl.'s Exh. B at 4.  The NSA did not process what Plaintiff is referencing because it is a "dynamic web interface" that includes "drop down menus and radio buttons" which change depending on what selections are made.  Supplemental Declaration of Linda M. Kiyosaki ¶ 10.  This interface, which was in use for the entirety of the time frame specified in Plaintiff's request, is no longer in use, thus no "static version" that would constitute a record exists.  *Id. ¶* 10 & n.7.

---

[8] Plaintiff relies on *Coleman v. DEA*, 134 F. Supp. 3d 294, 302 (D.D.C. 2015), but in that case, the court held that the agency's search was inadequate where the agency identified letters suggesting that a particular office would have responsive records and then failed to search that office.  *See* Pl.'s brief at 35.

Plaintiff also highlights the "Annual Report on Violations of Law or Executive Order," which he claims is submitted by ODNI to the Congressional intelligence committees pursuant to IC Directive 112.  Pl.'s brief at 33, citing Pl.'s Exh. B at 5.  Section D7 of IC Directive 112 refers to an Annual Report on Violations of Law or Executive Order, and explains that "ODNI shall annually submit to the Congressional intelligence committees a report of violations of law or executive order relating to intelligence agencies by personnel of elements of the IC."  These reports are to describe any such violations that were determined by the director, head, or General Counsel of the IC element to have occurred; referred to DOJ for possible criminal prosecution; or substantiated by the Inspector General of any IC element.  Plaintiff's assumption that these annual reports are responsive to his request for "reports involving the process for unmasking, or requesting unmasking, including reports on any incidents of policy violations, from January 1, 2015 to February 1, 2017" depends on his speculation that the annual reports for 2015 or 2016 included incidents of unmasking policy violations by personnel of IC elements that were determined by the director, head, or General Counsel of the IC element to have occurred; referred to DOJ for possible criminal prosecution; or substantiated by the Inspector General of any IC element.  Such speculation is not sufficient to undermine the adequacy of (presumably) ODNI's search.  *See, e.g.*, *SafeCard Servs., Inc.*, 926 F.2d at 1200.

Similarly, Plaintiff's claim that NSD and ODNI's bimonthly[9] reports of their review of the agencies' compliance with their minimization procedures, issued between Jan. 1, 2015 and Feb. 1, 2017, should have been produced in response to Part 1 of the request, relies on speculation that such compliance reviews identified unmasking violations.  Pl.'s brief at 33, citing Pl.'s Exh. B at 5, citing Section 707(b)(1)(F) of FISA.  The referenced reports are reports

---

[9] Plaintiff has pointed to no evidence that *bi-monthly* reports are submitted to Congress from the Attorney General and the Director of National Intelligence.

of "compliance reviews conducted by the Attorney General or the Director of National Intelligence of acquisitions authorized under section 1881a(a) of this title."  50 U.S.C. § 1881f(b)(1)(F).  Section 1881a(a), in turn, authorizes the Attorney General and the Director of National Intelligence to authorize targeting of "persons reasonably believed to be located outside the United States to acquire foreign intelligence information."  Plaintiff's belief that these reports are responsive to his request for "reports involving the process for unmasking, or requesting unmasking, including reports on any incidents of policy violations, from January 1, 2015 to February 1, 2017" depends on speculation that any of the compliance reviews for this time frame contained compliance incidents about unmasking—speculation that is insufficient to undermine the adequacy of NSD and ODNI's searches.  *See, e.g.*, *SafeCard Servs., Inc.*, 926 F.2d at 1200. NSD provided relevant agency personnel with Plaintiff's FOIA request but returned no responsive records.  *See* Findlay Decl. ¶ 20.

Plaintiff also claims that "the letters to agencies from Congressional leadership" that he discusses in paragraphs 15-16 of his Statement of Undisputed Facts "surely pertain to several items of Plaintiff's requests."  Pl.'s brief at 35.  But neither paragraph discusses anything that could be considered a "report on any incidents of policy violations."  Paragraph 15 refers to a letter talking about the *possibility* of using U.S. person information for partisan political purposes, and unmasking, as opposed to improper unmasking.  Similarly, paragraph 16 refers to a congressional letter to ODNI that attached a letter merely expressing concern about the alleged unmasking of an unnamed senator.  Both letters are also outside the date range of Part 1 of Plaintiff's request, nor would they be responsive to Part 4, which only asks for materials sent *in response to* a congressional inquiry.

Other than pointing to allegedly responsive records to undermine the agencies' searches, Plaintiff makes certain specific challenges to the adequacy of the FBI's, NSD's, and State's searches. Plaintiff claims that the FBI failed to search for "reports on any incidents of policy violations" and instead only searched for policies and procedures governing unmasking. Pl.'s brief at 36-37. However, the FBI's declaration clearly states that the office most likely to have responsive information, the Office of General Counsel's National Security and Cyber Law Branch ("NSCLB"), was provided "a copy of Plaintiff's request . . . to help facilitate the identification of and search for responsive records." Hardy Decl. ¶ 83. FBI clarifies in its supplemental declaration that it indeed asked NSCLB to search for *any* records responsive to the FOIA request, not just "policy" records, and provided a copy of the request to NSCLB to help facilitate the search. Sec. Hardy  Decl. ¶ 12. However, in an abundance of caution, the FBI revisited the issue with NSCLB, and NSCLB specifically searched for responsive reports. *Id.* No additional responsive records were identified. *Id.* The FBI's search was more than adequate.

Plaintiff's specific challenge to the adequacy of NSD's search is the claim that NSD failed to produce the "court-approved minimization procedures" that NSD's Office of Intelligence ("OI") had in its files, according to its declaration. Pl.'s brief at 37-38 (citing Findlay Decl. at 9 n.11). The Findlay Declaration states that "OI does oversee and report to the Foreign Intelligence Surveillance Court on IC elements' dissemination policies in accordance with court-approved minimization procedures. Those minimization procedures, which are in OI files, while creating the requirement that IC elements mask certain intelligence products, are not themselves the 'policies, procedures, and reports involving the process for unmasking' requested in Item 1." Findlay Decl. n. 11. The minimization procedures referenced in the Findlay Declaration were those of other agencies, not minimization procedures for NSD, because NSD

does not have its own minimization procedures.  Declaration of Kevin G. Tiernan ¶ 5.  The minimization procedures referred to in NSD's declaration were produced to Plaintiff by ODNI. *Id.*  Thus, Plaintiff has been provided with these documents.

Lastly, Plaintiff claims that State's search was inadequate for two reasons: (1) State failed to search the Office of the United Nations Ambassador and (2) State did not use "unmask" as a stand-alone term.  Pl.'s brief at 38-39.  Plaintiff argues that State should have searched the office of the United States Ambassador to the United Nations, as well as the offices of any other official with the authority to request unmasking, for policies, procedures, or reports related to unmasking because of media coverage indicating that U.N. Ambassador Samantha Power made unmasking requests.  But it is eminently more reasonable and efficient to search for policies, procedures, and reports on the process for unmasking and requesting unmasking in the State Department offices that would be responsible for, or involved in, developing such policies, procedures and reports, in this case the Bureau of Intelligence and Research, and the Office of Law Enforcement and Intelligence within the Office of the Legal Adviser, which State searched. State would not be required to search for duplicate copies of such policies and procedures that might be in the possession of an individual who has authority to make an unmasking request. *See Competitive Enterprise Institute v. Office of Science and Technology Policy*, 241 F. Supp. 3d 14, 22-23 (D.D.C. 2017 (FOIA does not require agencies to produce duplicate records).

As to the second issue, Plaintiff argues that State's search terms were inadequate because the agency failed to use "unmask" as a stand-alone term.  Pl.'s brief at 39.  Plaintiff concedes that agencies have discretion to craft search terms that are reasonable, but claims that State's use of the term "unmask" along with "FISA" was unduly restrictive, claiming that the documents disclosed by other agencies show that the term "unmask" is frequently used without the term

"FISA."  However, State *did* use "unmask" as a stand-alone term in its initial search, as State

explains in a supplemental declaration, and when it conducted a responsiveness review of a

sample of those hits, the agency determined that none of the documents within the sample were

responsive, as the records used the term "unmask" in a non-FISA context.  Declaration of Susan

Weetman ¶ 4.  For example, among the sample was a news article related to the "unmasking" of

Jihadi John, which referenced the identification of an Islamic State terrorist who ordinarily wore

a physical mask during filmed executions but was seen in a video without his mask.  *Id.* ¶ 4 n.2.

State also found records which referenced the "unmasking," or revelation, of foreign financial

support for a terrorist organization.  *Id.* ¶ 4.  Given these results, it was reasonable for State to

use "unmask" in conjunction with "FISA" (and, in another search conducted at the same time, in

proximity to "policy" or "procedure" or "report") to elicit records responsive to Plaintiff's

request.

## IV.   PLAINTIFF DOES NOT CHALLENGE ANY OF DEFENDANTS' WITHHOLDINGS OF INFORMATION UNDER FOIA EXEMPTIONS

Importantly, Plaintiff does not challenge the sufficiency of any of the defendant agencies'

withholdings of information pursuant to FOIA exemptions.  However, even when a plaintiff does

not directly challenge a withholding by an agency, a court must still determine whether the

agency "has shown that the undisputed material facts entitle it to summary judgment."  *Pinson v.*

*United States Dep't of Justice*, 243 F. Supp. 3d 74, 79 (D.D.C. 2017) (*citing Winston & Strawn,*

*LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016)).  Here, the FBI, ODNI, NSA, and CIA all

met this standard in their declarations for records withheld in full or in part.  Def.'s MSJ 32-40;

Hardy Decl. ¶¶ 86-119; Gaviria Decl. ¶ 48-52; Thompson Decl. ¶¶ 23-37, 52-75, Exh. M; Shiner

Decl. ¶¶ 20-26.  Therefore, summary judgment should be entered in favor of Defendants with

regards to their withholdings.

## <u>CONCLUSION</u>

For the foregoing reasons, and the reasons in Defendants' opening brief and declarations, Defendants respectfully request that the Court deny Plaintiff's Cross Summary Judgment Motion and grant Defendants' Motion for Summary Judgment.

Dated: August 23, 2019

HASHIM MOOPPAN
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Laura Hunt*
LAURA HUNT
Trial Attorney
Maryland Bar Member
United States Department of Justice
Civil Division, Federal Programs
Branch
1100 L St. NW
Washington, D.C. 20530
(202) 616-8337 (office)
(202) 616-8470 (fax)
laura.a.hunt@usdoj.gov

*Attorneys for Defendants*