---------------------------------------------------

GENE C. SCHAERR,         )
                                    )
         Plaintiff,      )
                                    )
        v.               )      Civil Action No. 18-0575 (ABJ)
                                    )
UNITED STATES DEPARTMENT    )
OF JUSTICE, *et al.*,           )
                                    )
         Defendants.   )

---------------------------------------------------

## MEMORANDUM OPINION

On March 14, 2018, plaintiff Gene C. Shaerr, a Washington D.C. attorney, brought this suit against the U.S. Department of Justice ("DOJ"), including the Federal Bureau of Investigation ("FBI") and the National Security Division ("NSD"); the Office of the Director of National Intelligence ("ODNI"); the National Security Agency ("NSA"); the Central Intelligence Agency ("CIA"); and the Department of State ("State") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq* (2012). Plaintiff submitted a FOIA request to each of the six agencies, each with three of four parts, requesting documents concerning two procedures that intelligence agencies must follow regarding the collection, retention, and dissemination of information concerning "unconsenting United States persons," called "unmasking" and "upstreaming." Compl. [Dkt. # 1] ¶ 18; *see id.* ¶¶ 26–66. In response, each agency issued what is known as a "*Glomar* response," to parts 2 and 3 of the FOIA request, refusing to confirm or deny the existence of responsive records in the agencies' possession because that information would be covered by a FOIA exemption. Pl.'s Statement of Material Undisputed Facts [Dkt.

# 25-7] ("Pl.'s SUMF") ¶¶ 38–39, 42–46.[1]  As to the other parts of the FOIA requests, the agencies conducted searches and released some documents in full or in part while withholding some documents in full pursuant to Exemptions 1, 3, 6, 7(E) and 7(C).  *Id.* ¶¶ 50, 52, 53, 54, 55, 60–64.  Defendants moved for summary judgment, arguing that they had complied with their FOIA obligations.  Defs.' Mot. for Summ. J. [Dkt. # 20] ("Defs.' Mot.") at 5–7.  Plaintiff opposed the motion and filed his own motion for summary judgment.  Pl.'s Opp. and Cross-Mot. for Summ. J. [Dkt. # 25] ("Pl.'s Cross-Mot.").

Upon review of the full record, the Court will grant defendants' motion for summary judgment in part and deny it in part, and plaintiff's motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

### I.  Plaintiff's FOIA Requests

In July and August of 2017,[2] plaintiff submitted FOIA requests to each of the six defendant agencies.  Compl. ¶¶ 26–61.  The requests dealt with "unmasking" and "upstreaming of classified information" gathered under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801–1885c.  *Id.* ¶¶ 20–21.  Agencies may only disseminate information obtained through FISA to authorized recipients.  Decl. of David M. Hardy [Dkt. # 20-3] ("Hardy Decl.")

---

1    Plaintiff stated that he agreed with all defendants' undisputed material facts, although he asserts that they are incomplete.  Pl.'s SUMF at 1.  He incorporated defendants' undisputed facts into his statement of undisputed material facts.  *Id.*  The facts cited to here and in the background section appear in both plaintiff's and defendants' statements of undisputed facts.

2    Plaintiff submitted his FOIA request to FBI, NSA, CIA, and State on July 13, 2017.  Ex. K to Compl. [Dkt. # 1-11] ("FBI FOIA Request"); Ex. F of Compl. [Dkt. # 1-6] ("NSA FOIA Request"); Ex. Q to Compl. [Dkt. # 1-17] ("CIA FOIA Request"); Ex. T to Compl. [Dkt. # 1-20] ("State FOIA Request").  Plaintiff submitted his FOIA request to NSD on August 3, 2017.  Ex. A to Compl. [Dkt. # 1-1] ("NSD FOIA Request").  Plaintiff submitted the request to ODNI on August 17, 2017.  Ex. C to Compl. [Dkt. # 1-3] ("ODNI FOIA Request").

¶¶ 10–11.  Generally, for non-public information concerning an unconsenting United States person, agencies may only include the identity of the person in such a disclosure if it constitutes foreign intelligence, is necessary for the recipient to understand the foreign intelligence being transmitted, or is evidence of a crime.  *Id.* ¶ 11.  Otherwise, agency procedures require the agency to "mask" the identity of the unconsenting person by substituting it with a generic phrase, such as "U.S. person 1."  *Id.*  If revealing the unconsenting person's name is necessary to the dissemination of needed intelligence to protect national security, a U.S. government official may request that the masked information be revealed in a process known as "unmasking."  *Id.*

"Upstreaming" refers to a methodology for collecting intelligence information from internet communications pursuant to section 702 of FISA.  Hardy Decl. ¶ 12.  In "downstream" collection, agencies "collect [a] target's communications directly from the U.S. company that services the account."  *Id.*  With upstream collection, the NSA "collects [a] target's communications as they cross the backbone of the internet with the compelled assistance of companies that maintain those networks."  *Id.*  This includes information acquired about the targets, such as when the target is neither the sender nor the recipient of the collected information.  *Id.*  Upstream collection, therefore, may obtain information sent to or from the targets of the surveillance, as well as non-consenting U.S. persons who are not targets of the surveillance.  Defs.' Mot. at 5.

Specifically, the FOIA requests called for:

1. All policies, procedures, and reports involving the process for unmasking, or requesting unmasking, including reports on any incidents of policy violations, from January 1, 2015 to February 1, 2017.

2. All documents concerning the unmasking, or any request for unmasking, of any person listed below, from January 1, 2015 to February 1, 2017:

           a. Steve Bannon
           b. Rep. Lou Barletta
           c. Rep. Marsha Blackburn
           d. Florida Attorney General Pam Bondi
           e. Rep. Chris Collins
           f. Rep. Tom Marino
           g. Rebekah Mercer
           h. Steven Mnuchin
           i. Rep. Devin Nunes
           j. Reince Priebus
           k. Anthony Scaramucci
           l. Peter Thiel
           m. Donald Trump, Jr.
           n. Eric Trump
           o. Ivanka Trump
           p. Jared Kushner
           q. Rep. Sean Duffy
           r. Rep. Trey Gowdy
           s. Rep. Dennis Ross
           t. Pastor Darrell C. Scott
           u. Kiron Skinner

3. All documents concerning the upstreaming of the names of any individual listed in Question 2 above, from January 1, 2015 to February 1, 2017.

FBI FOIA Request; CIA FOIA Request; State FOIA Request; NSD FOIA Request; ODNI FOIA Request; NSA FOIA Request.

Plaintiff also requested a fourth category of documents from ODNI and NSD: "Copies of any materials sent in response to any inquiry from the House Intelligence Committee or other congressional committees regarding unmasking from January 1, 2017 to August 11, 2017." NSD FOIA Request; ODNI FOIA Request. Finally, plaintiff also asked NSA to produce "[a]ll reports

made to S12 and SV regarding improper dissemination of any individual listed in Question 2, above."  NSA FOIA Request.[3]

## II.    Agency Responses to Plaintiff's FOIA Requests

On August 24, 2017, FBI asserted *Glomar* responses to parts 2 and 3 of the FOIA request pursuant to FOIA Exemptions 6, and 7(C).  Hardy Decl. ¶¶ 15–16.  On December 21, 2017, plaintiff asked FBI to re-open parts 2 and 3 of his FOIA request, because he had obtained a privacy waiver for one of the individuals named in the request.  *Id.* ¶ 19.  The FBI reopened the request with respect to this individual on December 29, 2017, but on January 23, 2018, the FBI informed plaintiff that it could not confirm or deny the existence of documents pursuant to FOIA Exemptions 1 and 3.  *Id.* ¶¶ 20, 23.  The FBI did conduct a search in response to part 1 of the request, and it produced eight pages of a responsive record which were redacted pursuant to Exemptions 1, 3, 6, 7(C) and 7(E).  *Id.* ¶ 82.

On October 10, 2017, NSA issued *Glomar* responses to parts 2, 3, and 4 of plaintiff's request pursuant to FOIA Exemptions 1 and 3.  Decl. of Steven E. Thompson [Dkt. # 20-6] ("Thompson Decl.") ¶ 15.  As to part 1 of plaintiff's FOIA request, NSA conducted a search and identified six publicly available responsive records and told plaintiff where he could find them. *Id.*  After this lawsuit was filed, NSA released seven documents with redactions pursuant to Exemptions 1 and 3.  *Id.* ¶¶ 21–22.  It withheld in full fourteen documents pursuant to

---

3    "S12" refers to an organization within the NSA that governs the NSA's engagement with partners, customers, and stakeholders, including providing policy and implementation support to NSA's information sharing activities.  Decl. of Steven E. Thompson [Dkt. # 20-6] ("Thompson Decl.") ¶ 35 n.7.  "SV" refers to an organization within the NSA which provides compliance support to NSA, "including providing compliance guidance to NSA organizations, investigat[ing] and coordinat[ing] possible incidents, and provid[ing] support for external oversight activities."  *Id.* ¶ 35 n.8.

Exemptions 1, 3, and 5. *Id.* ¶¶ 21–23. Four of those fully withheld documents were later deemed nonresponsive. *Id.* ¶ 23.

On June 12, 2018, CIA informed plaintiff that it could neither confirm nor deny the existence of documents responsive to items 2 and 3 of plaintiff's request, pursuant to FOIA Exemptions 1 and 3. Decl. of Antoinette B. Shiner, Information Review Officer for the Litigation Information Review Office Central Intelligence Agency [Dkt. # 20-1] ("Shiner Decl.") ¶ 10. The CIA conducted a search for records responsive to the first part of the request and identified three responsive records, one of which was publicly available and contained redactions pursuant to Exemptions 1 and 3. *Id.* ¶ 17. The second document was released in part and the third document was fully withheld pursuant to Exemptions 1 and 3. *Id.* ¶¶ 10, 17.

On June 28, 2018, State issued *Glomar* responses to parts 2 and 3 of plaintiff's request under FOIA Exemptions 1 and 3. Decl. of Eric F. Stein [Dkt. # 20-12] ("Stein Decl.") ¶ 7. The agency conducted a search for records responsive to item 1 of plaintiff's request but found no records. *Id.*

On June 29, 2018, NSD issued *Glomar* responses to parts 2 and 3 of plaintiff's request pursuant to FOIA Exemption 1. Declaration of Patrick N. Findlay [Dkt. # 20-8] ("Findlay Decl.") ¶ 9. NSD conducted a search for records responsive to items 1 and 4 but found no records. *Id.*

On August 13, 2018, ODNI issued *Glomar* responses to parts 2 and 3 of plaintiff's request in accordance with FOIA Exemptions 1 and 3. Decl. of Patrick Gaviria, Director, Information Management Division, Office of the Director of National Intelligence [Dkt. # 20-10] ("Gaviria Decl.") ¶ 13. ODNI conducted a search for documents responsive to part 1 and identified fifteen publicly available documents, the links of which were provided to plaintiff. *Id.*

ODNI also conducted a search for part 4 of plaintiff's request and identified two responsive documents, which it withheld in part pursuant to FOIA Exemption 6. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Id.* at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

When considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may grant summary judgment based on information provided in an agency's affidavits or declarations when they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991) (citation omitted), and "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard*, 926 F.2d at 1200 (citation and internal quotation marks omitted).

The court must "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Military Audit Project*, 656 F.2d at 738 (deferring to the agency's assertions in holding that the information could cause serious damage to the national security); *see also Salisbury v. United States,* 690 F.2d 966, 970 (D.C. Cir. 1982). This is especially true "in a national security case, in which the agency possesses necessary expertise to assess the risk of disclosure," *Schlesinger v. CIA*, 591 F. Supp. 60, 67 (D.D.C. 1984), and judges "lack the expertise necessary to second-guess . . . agency opinions." *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980) (deferring to the agency's opinion and holding that certain CIA affidavits provided ample evidence to show potential harm under a limited *de novo* review).

## ANALYSIS

FOIA requires government agencies to release records upon request in order to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The statute provides that: "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. *See* § 552(b); *FBI v. Abramson*, 456 U.S. 615, 630–31 (1982). This framework

"represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003), citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989). When an agency withholds documents or parts of documents, it must explain what it is withholding and specify the statutory exemptions that apply. *See Vaughn v. Rosen*, 484 F.2d 820, 825–28 (D.C. Cir. 1973).

In this case, the pending motion for summary judgment argues that: (1) defendants properly asserted *Glomar* responses pursuant to Exemptions 1, 3, 6, 7(C), and 7(E); (2) defendants conducted adequate searches; and (3) defendants released all non-exempt information and properly withheld information under FOIA Exemptions 1, 3, 6, 7(C), and 7(E). *See* Defs.' Mot. Plaintiff opposed the motion and cross-moved for summary judgment, arguing that the *Glomar* responses were improper and the searches were inadequate. *See* Pl.'s Cross-Mot. However, plaintiff did not contest defendants' withholdings.[4] *See id*. at 32.

---

4      Plaintiff did not address defendants' withholdings in his cross-motion for summary judgment or his reply in support of his motion, although defendants raise this issue in their response to his cross-motion. Furthermore, in plaintiff's statement of undisputed material facts, he stated that each of the agencies withheld information pursuant to the claimed exemptions but did not object to them or dispute the propriety of the withholdings. *See* Pl.'s SUMF ¶¶ 61–64. Moreover, at the end of plaintiff's reply, he asked the Court to order defendants to conduct adequate searches and to produce certain documents, but does not ask the Court to do anything with regards to the withholdings. Pl.'s Reply in Supp. of his Cross-Mot. [Dkt. # 31] ("Pl.'s Reply") at 23–24.

Although "a motion for summary judgment cannot be 'conceded' for want of opposition," *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016),[5] courts in this district have observed that "this does not mean . . . that the Court must assess the legal sufficiency of each and every exemption invoked by the government in a FOIA case." *Shapiro v. DOJ*, 239 F. Supp. 3d 100, 105–06 n.1 (D.D.C. 2017). The *Shapiro* court stated:

> Where the FOIA requester responds to the government's motion for summary judgment without taking issue with the government's decision to withhold or to redact specific documents, the Court can reasonably infer that the FOIA requester does not seek those specific records or information and that, as to those records or information, there is no case or controversy sufficient to sustain the Court's jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To the extent the FOIA requester does not seek to compel the release of the withheld information, moreover, the Court need not—and should not—enter summary judgment

---

5       The Appeals Court underscored that the "District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Winston & Strawn*, 843 F.3d at 505, quoting *Grimes v. District of Columbia*, 794 F.3d 83, 95 (D.C. Cir. 2015). However, that ruling arose in the context of a case in which the district court exercised its discretion under the Local Rules to treat a summary judgment motion as conceded when the non-moving party failed to file any opposition at all. The Court stated:

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. And then a district court must always determine for itself whether the record and any undisputed material facts justify granting summary judgment. These standards cannot be satisfied if, as allowed by Local Rule 7(b), the District Court simply grants judgment "as conceded" when the nonmoving party fails to meet a deadline.

*Id.* at 507 (internal citations, quotation marks, and edits omitted).

But that is not what happened in this case. Defendants met their initial responsibility to inform the Court of the basis of their motion, and they pointed to the portions of the record that demonstrate the lack of any genuine issue of material fact. And here, unlike in *Winston & Strawn*, plaintiff filed a timely opposition to the motion for summary judgment. Thus, plaintiff has availed himself of the opportunity provided in Rule 56(c) to address all of defendants' assertions of fact, and, pursuant to Rule 56(e), the Court may consider facts "undisputed for purposes of the motion" when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . ." Fed. R. Civ. P. 56.

in favor of the government. Rather, unlike in *Winston & Strawn* and similar cases, there is simply no dispute to resolve.

*Id.* Following that reasoning, the Court will only address the legality of the *Glomar* responses and the adequacy of the searches, and it need not rule on the sufficiency of defendants' affidavits with respect to their withholding of material responsive to parts 1 and 4 of plaintiff's FOIA request. *See Judicial Watch, Inc. v. CIA*, No. 17-cv-397, 2019 WL 4750245 at *4 (D.D.C. Sept. 29, 2019); *Property of the People, Inc. v. DOJ*, No. 17-cv-1728, 2019 WL 4644572 (D.D.C. Sept. 24, 2019).

## I. Defendants' *Glomar* responses are justified under FOIA Exemptions 1 and 3.[6]

In some circumstances, the government "may refuse to confirm or deny the existence of records" responsive to a FOIA request. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007), quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). This is called a "*Glomar* response,"[7] *id.*, and such a response is appropriate when merely revealing the fact that an agency possesses responsive records would itself "cause harm cognizable under [a] FOIA exception." *Id.*, quoting *Gardels*, 689 F.2d at 1103.

To justify a *Glomar* response, the agency must supply the court with a detailed affidavit that explains why it cannot provide a substantive response pursuant to a FOIA exemption. *Elec.*

---

6   The FBI also invoked FOIA Exemptions 6, 7(C) and 7(E) in issuing its *Glomar* response. Defs.' Mot. at 20–23. Because the Court finds that its *Glomar* response was proper under FOIA Exemptions 1 and 3, it need not analyze whether it was also proper under Exemptions 6 or 7. *See Larson v. Dep't of State*, 565 F.3d 857, 862–63 (D.C. Cir. 2009) ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").

7   The term "*Glomar* response" originates from the CIA's refusal to confirm or deny the existence of records in response to a FOIA request relating to "the *Hughes Glomar Explorer*, a ship used in a classified [CIA] project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.'" *Roth v. DOJ*, 642 F.3d 1161, 1171 (D.C. Cir. 2011), quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981).

*Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). To determine whether a *Glomar* response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374.

The six defendants issued *Glomar* responses under FOIA Exemption 1 in response to parts 2 and 3 of plaintiff's FOIA request, which asked for documents related to unmasking or upstreaming of twenty-one specific individuals between January 1, 2015 to February 1, 2017. Defs.' Mot. at 13. NSA also issued a *Glomar* response pursuant to Exemption 1 in response to item 4 of plaintiff's request, which asked for reports made to "S12 and SV regarding improper dissemination" of those twenty-one individuals. *Id.* at 17.

FOIA Exemption 1 provides that matters "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder" are exempt from production under FOIA. 5 U.S.C. § 552(b)(1). The D.C. Circuit has advised courts to accord substantial deference to an agency's *Glomar* response and avoid "searching judicial review" when the information requested "implicat[es] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27; *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987) ("[T]he court owes substantial weight to detailed agency explanations in the national security context."). "The [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. Dep't of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011) ("*ACLU I*"), quoting *Wolf*, 473 F.3d at 374–75; *see also Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified.").

Each agency points to Executive Order 13,526 to invoke this exemption. The Executive Order provides that information may be classified if the following conditions are met: (1) an "original classification authority" classifies the information; (2) "the information is owned by, produced by or for, or is under the control of the United States Government"; (3) the information falls within at least one of the categories listed in section 1.4 of the Order; and (4) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security." Exec. Order 13,526 § 1.1, 75 Fed. Reg. 707, 709 (Jan. 5, 2009).

The categories of information specified in section 1.4 include "foreign relations," "military plans," "intelligence activities (including covert action), intelligence sources or methods" and more. *Id.* § 1.4. The Executive Order further states that an agency "may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified." *Id.* § 3.6(a).

With respect to the first condition, each agency has submitted an affidavit from an individual designated as an original classification authority stating that the information is properly classified. Thompson Decl. ¶¶ 2–3; Findlay Decl. ¶¶ 3, 13; Stein Decl. ¶¶ 1, 38; Shiner Decl. ¶¶ 2, 22; Hardy Decl. ¶¶ 2, 40; Gaviria Decl. ¶¶ 3, 29. Plaintiff does not contest the second condition: that the documents he seeks are owned by, produced by or for, or under the control of the United States government.

Each affiant avers that disclosing the existence of records about the "unmasking" or "upstreaming" of particular individuals pertains to intelligence activities and intelligence sources and methods, which is a category of information that can be classified pursuant to § 1.4 of the Executive Order, and that disclosure of whether or not these documents exist reasonably could

be expected to result in damage to national security.  Thompson Decl. ¶¶ 37–39; Findlay Decl. ¶¶ 14–15; Shiner Decl. ¶ 22; Stein Decl. ¶ 31; Gaviria Decl. ¶¶ 39–45; Hardy Decl. ¶ 36.  Each declarant averred that revealing the existence of documents related to unmasking and upstreaming of the twenty-one named individuals would necessarily reveal whether those individuals were identified in intelligence reports, whether the agency possessed any FISA-derived intelligence information on those individuals, whether the agency disseminated any such intelligence information, and whether the agency unmasked, or was asked to unmask, the individuals' identities.  Findlay Decl. ¶¶ 10–15; Hardy Decl. ¶¶ 11–12; Stein Decl. ¶¶ 33–35; Shiner Decl. ¶¶ 30–33; Thompson Decl. ¶ 35; Gaviria Decl. ¶¶ 42–46.  It would also show that these agencies used certain intelligence methods, and it would reveal the intelligence community's interest, or lack of interest, in those individuals.  Stein Decl. ¶¶ 34–35; Gaviria Decl. ¶¶ 39–40; Thompson Decl. ¶ 40; Shiner Decl. ¶¶ 30–32; Findlay Decl. ¶ 15; Hardy Decl. ¶¶ 41–42.

Each declarant explained that even disclosing whether documents exist could damage national security because it would provide crucial information to adversaries regarding the agency's priorities, interests, capabilities, activities, and methods, and that information could be used against the United States to impair the intelligence community's ability to gather information.[8]  Gaviria Decl. ¶ 45; Stein Decl. ¶¶ 30–33; Shiner Decl. ¶¶ 31–32; Findlay Decl. ¶ 14; Thompson Decl. ¶¶ 39–40; Hardy Decl. ¶ 39.  Furthermore, the information may disclose

---

[8]    Plaintiff asserts, with no basis, that merely revealing whether a person was unmasked would not undermine intelligence sources, methods, or national security, because plaintiff assumes that given the notability of the people on his list, it is likely that their names came up many times in surveilled communications.  Pl.'s Cross-Mot. at 21.  But whether or not a name was mentioned once or thousands of times does not change the fact that revealing such information would necessarily reveal the intelligence community's priorities, methods, and sources.

"how intelligence is shared, analyzed, and used throughout the Intelligence Community and Executive Branch" Stein Decl. ¶ 35, which could degrade the usefulness of the information or the continued usefulness of the intelligence collection method. Findlay Decl. ¶ 14.

For example, CIA's information officer stated that "the withheld information would provide sensitive details as to how foreign intelligence is acquired, retained and disseminated, thereby revealing strengths, weaknesses, and gaps in intelligence coverage." Shiner Decl. ¶ 24. Such information, if released, could be used by adversaries "to undermine U.S. intelligence capabilities and render collection efforts ineffective." *Id.* NSA confirmed that disclosure of this information would inhibit intelligence collection which would "affect NSA's ability to counter threats to the national security of the United States." Thompson Decl. ¶ 39. Disclosure could also cause damage to national security "by providing our adversaries a road map that instructs them on which communication modes or personnel remain safe or are successfully defeating NSA's capabilities." *Id.* ¶ 41. Furthermore, FBI asserted that "terrorist organizations and other hostile Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details . . . . Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data." Hardy Decl. ¶ 43.

NSA also asserted a *Glomar* response pursuant to FOIA Exemption 1 to part 4 of the FOIA request, which asked for "[a]ll reports made to S12 and SV regarding improper dissemination of any individual listed in Question 2." Thompson Decl. ¶ 11. S12 refers to an organization within the NSA that governs "NSA's engagement with partners, customers, and stakeholders, including providing policy and implementation support to NSA's information

sharing activities." *Id.* ¶ 35 n.7. SV refers to an organization which provides "compliance support to NSA, including providing compliance guidance to NSA organizations, investigates and coordinates possible incidents, and provides support for external oversight activities." *Id.* ¶ 35 n.8. NSA stated in its declaration that disclosing the existence of information responsive to this request "would tend to reveal information about NSA's intelligence . . . sources and methods," *id.* ¶ 37, and "could reasonably be expected to harm national security because it would reveal NSA capabilities, activities, and intelligence priorities, which in turn could inhibit [signal intelligence] collection and affect NSA's ability to counter threats to the national security of the United States." *Id.* ¶ 39. Furthermore, information about particular individuals would provide adversaries with "critical information about the capabilities and limitations of NSA." *Id.* ¶ 40.

Each agency's declarant averred that the information was properly classified under Executive Order 13,526. Shiner Decl. ¶ 22; Hardy Decl. ¶ 35; Thompson Decl. ¶ 44; Gaviria Decl. ¶ 29; Stein Decl. ¶ 38; Findlay Decl. ¶ 16. Each agency also confirmed that the information at issue was not classified to "[(1)] conceal violations of law, inefficiency, or administrative error; [(2)] prevent embarrassment to a person, organization, or agency; [(3)] restrain competition; or [(4)] prevent or delay the release of information that does not require protection in the interest[s] of national security."[9] Thompson Decl. ¶ 43; Findlay Decl. ¶ 17; Stein Decl. ¶ 37; Shiner Decl. ¶ 22; Hardy Decl. ¶ 45; Gaviria Decl. ¶ 42.

The Court "accord[s] substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record because the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic]

---

9     Plaintiff argues that the documents would contain evidence of illegal political targeting, which the agencies would be motivated to withhold. Pl.'s Cross-Mot. at 20, 22. But the affidavits have explicitly stated that the *Glomar* responses were not issued to cover up a violation of law, and the plaintiff has not submitted any evidence to support his contention.

might occur as a result of a particular classified record." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927, quoting *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983). Thus, after thoroughly examining the declarations submitted by the six agencies in support of their motion, the Court finds that the information is properly classified pursuant to an Executive Order and properly falls within FOIA Exemption 1. The Court is satisfied that defendants have put forth a "plausible" and "logical" argument in support of their *Glomar* responses.[10] *ACLU I*, 628 F.3d at 624.

Defendants, except for NSD, have also justified their *Glomar* responses to parts 2 and 3 of plaintiff's request under FOIA Exemption 3.[11] Defs.' Mot at 18–20. FOIA Exemption 3 permits an agency to withhold records that are "specifically exempted from disclosure by statute," provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or establishes particular criteria for withholding or refers to particular types of matters to be withheld." § 552(b)(3). Because each agency's declaration identifies the statute that excludes the information and establishes that the

---

10      The FBI also argued, in a footnote, that plaintiff "failed to exhaust his administrative remedies with respect to the FBI's *Glomar* assertion pursuant to Exemptions 1 and 3." Defs.' Mot. at 13 n.1. Because a FOIA requester must exhaust his administrative remedies before bringing a challenge to an agency's response, and because plaintiff filed his appeal to this Glomar determination only after he filed suit, defendant FBI argues that plaintiff's challenge to the FBI's *Glomar* assertion pursuant to Exemptions 1 and 3 should be dismissed for failure to exhaust administrative remedies. *Id.* Because the Court has already determined that FBI's Glomar responses were appropriate, it need not address this argument.

11      NSD did not assert a *Glomar* response pursuant to FOIA Exemption 3, but all other defendants did. Defs.' Mot. at 18.

information falls within the statute's scope,[12] the Court finds that FOIA Exemption 3 was properly invoked. *See Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978) (holding that in FOIA Exemption 3 cases "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage").

Plaintiff makes several arguments against defendants' invocation of the *Glomar* responses. First, he argues that the public importance of these documents outweighs any national security interest, and for this reason, the records should be disclosed. Pl.'s Cross-Mot. at 14–17. But, plaintiff does not cite any case law that supports his contention that a strong public interest can overcome FOIA Exemption 1 or 3. As defendants point out, this argument is pertinent only to the FBI's assertion of Exemptions 6 and 7(C), because public interest in disclosure is a factor in analyzing whether those exemptions should apply. Defs.' Opp. to Pl.'s Cross-Mot. [Dkt. # 26] at 8 n.5. Since the Court has found that the *Glomar* responses were appropriate in accordance with Exemptions 1 and 3, this argument is inapposite.

Second, plaintiff argues that defendants have acted in bad faith in asserting the *Glomar* responses, and thus summary judgment should be entered in his favor. *See* Pl.'s Cross-Mot. at 17–22. Plaintiff contends that where a requestor establishes bad faith on the part of the agency, "a *Glomar* response is inappropriate," *id*. at 18, and he points to *Jones v. FBI*, 41 F.3d 238, 242–44 (6th Cir. 1994) for support. *Jones* involved a FOIA request sent to the FBI by the leader of a group called Afro Set. *Id.* at 239. Afro Set was a target of the FBI's Black Nationalist Counterintelligence Program ("COINTELPRO"), which was initiated in 1965. *Id.* In 1970,

---

12      NSA points to the National Security Agency Act, 50 U.S.C. § 3605(a), the Intelligence Reform and Terrorism Prevention Act, 50 U.S.C. § 3024, and 18 U.S.C. § 798. *See* Thompson Decl. ¶¶ 47–49. FBI, CIA, ODNI, and State all point to the National Security Act, 50 U.S.C. § 3024(i)(l). *See* Hardy Decl. ¶¶ 46–48; Shiner Decl. ¶ 26; Gaviria Decl. ¶ 32; Stein Decl. ¶¶ 39–41. The protections provided by 50 U.S.C. § 3605(a) and § 3024 are absolute. *See, e.g.*, *Linder v. NSA*, 94 F.3d 693 (D.C. Cir. 1996); *CIA v. Sims*, 471 U.S. 159 (1985).

members of Afro Set shot two police officers, and Jones was convicted in state court of second-degree murder for the shooting. *Id.* at 241. Jones filed FOIA requests in 1975, along with a petition for writ of habeas corpus, requesting documents pertaining to himself or Afro Set held by the FBI and the U.S. Secret Service. *Id.* at 239, 241. In 1976, the Senate Select Committee on Intelligence issued a report documenting systematic violations of civil rights by the FBI and other intelligence and security organizations, and COINTELPRO was one of the operations discussed in the report. *Id.* at 240.

The Sixth Circuit found that plaintiff had supplied evidence of bad faith, since it was well-documented that COINTELPRO "went beyond the detection and prevention of criminal activity." *Id.* at 243. The court noted that "the program's infringements of civil liberties seem well documented; and because the FBI worked closely with local law enforcement and supplied the key prosecution witness, the program is tied to the tainted prosecution of plaintiff for murder." *Id.* The court observed that this did "not prove that the FBI acted in bad faith with regard to the FOIA request," but that it meant that courts "should not process this case in the same manner as they would a request for documents regarding a routine FBI investigation." *Id.* Thus, the court concluded that, rather than accepting the agencies' affidavits alone, the set of circumstances warranted *in camera* review of a percentage of the disclosed documents as well. *Jones*, 41 F.3d t 243–44.

The *Jones* case provided important guidance for how to proceed in the unique situation before it, but it has little to do with the questions before this Court. The defendant agencies in *Jones* did not assert *Glomar* responses – they produced thousands of documents and withheld some pursuant to Exemptions 1, 2, 7(C), 7(D), and 7(E). *See id.* Furthermore, *Jones* is not

binding on this Court, and more important, plaintiff here has not come forward with a strong showing of bad faith by the government. He alleges:

- "The current Attorney General, former Acting Attorney General, and former Director of National Intelligence have all admitted that [they] either unmasked or 'spied' on members of the Trump campaign or Trump transition team …." Pl.'s Cross-Mot. at 19, citing Pl.'s SUMF ¶¶ 14, 17.

- "President Trump, the White House Press Secretary, and the previous chairman of the House Intelligence Committee have all stated that this unmasking of Trump associates was illegal." *Id.*, citing Pl.'s SUMF ¶¶ 7–13

- "[T]he U.N. Ambassador Samantha Power requested nearly 270 unmaskings during the last months of her service. It is clear these requests were made. Less clear is who in the office made the requests – Power insists that it was not her and that someone in her office must have filed the requests in her name – an obviously important area for investigation." *Id.*, citing Pl.'s SUMF ¶¶ 19–23.

- Representative Nunes described the records at issue as having "no apparent foreign intelligence value." *Id.*, citing Pl.'s SUMF ¶ 7.[13]

Some of these circumstances may be relevant to an "official acknowledgement" argument, *see infra* Section II, but they are not relevant to demonstrate the bad faith that would undermine agency affidavits because the information above has nothing to do with plaintiff's FOIA request itself or the agencies' *Glomar* responses. *See Larson*, 565 F.3d at 864 (finding that "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith" and finding no bad faith on the part of the CIA in withholding CIA intelligence cables), quoting *Miller v. Casey*, 730

---

13    Plaintiff designates these statements as undisputed "facts." While the fact that they were made may not be disputed, the opinions and legal conclusions advanced cannot be fairly described as "facts."

F.2d 773, 776 (D.C. Cir. 1984). Moreover, the observations are largely statements of opinion, not analogous to the Senate Select Committee on Intelligence Report. Thus, plaintiff has not demonstrated bad faith so as to warrant denying defendants' motion for summary judgment.

Finally, plaintiff argues that defendants should at least be required to do a search for the documents, because defendants may find documents that are responsive to plaintiff's request and do not fall within FOIA Exemptions 1 and 3. Pl.'s Cross-Mot. at 24. Or, plaintiff maintains, defendants could redact documents in such a way so as to not compromise national security.[14] *Id.* at 26. But neither of these options address the agencies' concerns about the potential harm caused by merely revealing the records' existence.

---

14      Plaintiff also asserts that the Court should conduct *in camera* review of any responsive documents. Pl.'s Cross-Mot. at 16. While FOIA provides district courts the option to conduct *in camera* review, § 552(a)(4)(B), "it by no means compels the exercise of that option." *Juarez v. DOJ*, 518 F.3d 54, 60 (D.C. Cir. 2008). If the agency's affidavits "provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979); *see also Weissman v. CIA,* 565 F.2d 692, 697 (D.C. Cir. 1977). The Court of Appeals has made clear that when the agency meets its burden by means of affidavits, *in camera* review is neither necessary nor appropriate. *Larson*, 565 F.3d at 869–70, quoting *Hayden*, 608 F.2d at 1387. Finally, the purpose of *in camera* review is to consider the applicability of an exemption to a specific record; plaintiff points to no case law that would suggest that *in camera* review is a tool for testing an agency's assertion that merely revealing the existence of records would cause harm.

## II. Defendants have not waived their right to issue *Glomar* responses.

Plaintiff argues that the agencies have waived their right to issue *Glomar* responses because the government has already officially acknowledged that the information exists. Pl.'s Cross-Mot. at 28–32.

A FOIA plaintiff may compel disclosure of information "even over an agency's otherwise valid exemption claim" if the government previously "officially acknowledged" the information. *ACLU I*, 628 F.3d at 620. The rationale behind the doctrine is that once information has become public, any harm the agency fears from disclosure has already been sustained. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999). This is commonly referred to as an "official acknowledgment" challenge or the "public domain exception." *See ACLU v. CIA*, 710 F.3d 422, 426–27 (D.C. Cir. 2013) ("*ACLU II*") (using the terms interchangeably).

The D.C. Circuit has established a "strict test" to be applied to claims of official disclosure. *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). Information is officially acknowledged by an agency where: (1) "the information requested [is] as specific as the information previously released," (2) the requested information "match[es] the information previously disclosed," and (3) the requested information was already "made public through an official and documented disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).

A plaintiff mounting this type of challenge "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State,* 702 F.2d 1125, 1130 (D.C. Cir. 1983). In *Glomar* cases, a plaintiff need not show that that the contents of the requested records have been disclosed; rather, consistent with the nature of the exemption being invoked, the plaintiff must establish that the agency has

previously acknowledged the fact of the "existence" of responsive records. *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012).

The D.C. Circuit has articulated the official acknowledgment test in *Glomar* cases as follows:

> [I]f the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue – the existence of records – and the specific request for that information.

*Wolf*, 473 F.3d at 379 (emphasis in original). In *Wolf v. CIA*, the D.C. Circuit made plain that in order to overcome an agency's *Glomar* response based on official acknowledgment, the requesting plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged *by the agency*. *Wolf*, 473 F.3d at 378–79. This standard has been reaffirmed by the D.C. Circuit in subsequent *Glomar* cases. *See Moore*, 666 F.3d at 1333 (holding that a plaintiff must "pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency"); *see also Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) (re-stating the three-part *Fitzgibbon* official acknowledgment test).

In the highly sensitive context involving issues of national security "[a]n agency's official acknowledgment . . . cannot be based on . . . speculation, no matter how widespread." *Wolf*, 43 F.3d at 378. As the Appeals Court noted in *Wolf*, "[t]he insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Id.*, quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993).

In support of his official acknowledgment argument, plaintiff points to the following public statements:

- Representative Devin Nunes, on March 22, 2017, stated that he "recently confirmed that, on numerous occasions, the Intelligence Community incidentally collected information about U.S. citizens involved in the Trump transition" and that "additional names of Trump transition team members were unmasked." Pl.'s SUMF ¶ 7, citing Chairman Nunes Comments on Incidental Collection of Trump Associates, Mar. 22, 2017.

- In July 2017, Representative Nunes wrote a letter to Director of National Intelligence Dan Coats, stating that the Intelligence Committee "found evidence that current and former government officials had easy access to U.S. person information and that it is possible that they used this information to achieve partisan political purposes, including the selective anonymous leaking of such information." That letter also stated that a high-ranking Obama Administration official had made numerous requests to unmask certain people. Pl.'s SUMF ¶ 15.

- In September 2017, Press Secretary Sarah Huckabee Sanders, in a statement to CNN regarding Susan Rice's alleged unmasking, stated: "We've seen illegal leaking of classified materials, including the identities of American citizens unmasked in intelligence reports. . . . That's why the President called for Congress to investigate this matter and why the Department of Justice and Intelligence Community are doing all they can to stamp out this dangerous trend that undermines our national security." Pl.'s SUMF ¶ 11.

- On September 14, 2017, President Trump, when asked about Susan Rice's alleged unmasking of people within his campaign stated: "She's not supposed to be doing that, and what she did was wrong. And we've been saying that, and that's just the tip of the iceberg. What she did was wrong. The unmasking and the surveillance, and I heard she admitted that yesterday. Just not right." Pl.'s SUMF ¶ 12.

- On April 3, 2017, President Trump tweeted: "Such amazing reporting on unmasking and the crooked scheme against us by @foxandfriends. 'Spied on before nomination.' The real story." Pl.'s SUMF ¶ 8, citing Donald Trump Twitter (Apr. 3, 2017, 6:15 AM) https://twitter.com/realdonaldtrump/status/848841326183534594. Fox and Friends reported earlier that "West Wing officials ordered unmasking months before the [Republican National Convention]." *Id.* President Trump later tweeted that "[t]he big story is the 'unmasking and surveillance' of people that took place during the Obama Administration." *Id.* ¶ 9, citing Transcript of Fox and Friends, (April 3, 2017), archived at https://archive.org/details/FOXNEWSW_20170403_100000_FOX__Frien ds/start/240/end/300.

- President Trump has tweeted that the Attorney General should investigate "corruption on the 'other side' including . . . illegal surveillance of Trump Campaign." Pl.'s SUMF ¶ 13.

- Director of National Intelligence James Clapper and former Acting Attorney General Sally Yates "testified before the Senate under oath that they had viewed intelligence documents in which members of Congress or Trump officials had been unmasked." Pl.'s Reply at 6, citing Sen. Grassley "Did either of you ever request unmasking of Trump or...", grills Yates and Clapper - Russian Interference in 2016 Elections (May 8, 2017), https://www.c-span.org/video/?c4668828/sen-grassley-did-request-unmaskingtrump-or-grills-yates-clapper-russian-interference-2016 (beginning at 3:05). In response to a question asking whether Clapper had requested the unmasking of President Trump, his associates, or any member of Congress, he testified that on at least one occasion, he had, but could not speak about it further. *Id.*

None of these alleged "official acknowledgements" qualify. Congressmen Nunes serves in the legislature, not the executive branch, and does not speak for the agency. *See, e.g.*, *EPIC v. NSA*, 678 F.3d 926, 931 n.5 (D.C. Cir. 2012); *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), citing *Fitzgibbon*, 911 F.2d at 765 (CIA could refuse to disclose classified information even if already reported in congressional committee report); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) ("[B]are discussions by this court and the Congress of [the National Security Agency's] methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering").

White House Press Secretary Sarah Sanders served within the Office of the President, which oversees the other executive agencies. The D.C. Circuit has held that where "disclosures are made by an authorized representative of the agency's parent," they can qualify as an official statement as to waive the *Glomar* response. *ACLU II*, 710 F.3d at 429 n.7. But the Court need not decide whether the White House Press Secretary is an "authorized representative of the agency's parent," because Sanders's statement does not satisfy the other elements of the official acknowledgement test: her general statement referencing the unmasking of "American citizens"

is not "as specific" or "match the information" requested about particular individuals. *Fitzgibbon*, 911 F.2d at 765; *see also Afshar*, 702 F.2d at 1133 (broad disclosures on the same topic do not waive the *Glomar* response).

James Clapper could speak for the CIA, and Sally Yates could speak for the DOJ, FBI, and NSD, but the statements by these individuals similarly do not satisfy the other elements of the test. The testimony of James Clapper and Sally Yates suffers from the same deficiency as Sanders's statement. Their testimony generally acknowledged that they had viewed documents in which Congressmen and Trump officials had been unmasked, and Clapper testified that on at least one occasion he had requested unmaskings of "Congressmen and Trump associates." But this testimony does not confirm that documents responsive to plaintiff's FOIA request, which specifies a time frame and names twenty-one individuals, definitively exist.

Finally, statements by the President qualify as statements by an "authorized representative of the agency's parent," *ACLU II*, 710 F.3d at 429 n.7,[15] but the President's tweets regarding unmaskings were not a confirmation of the existence of documents responsive to plaintiff's FOIA request, because the tweets only generally refer to unmasking. The official statements must "leave no doubt" that the agency possesses the requested records. *ACLU II*, 710 F.3d at 429. Here, there has been no express recognition of the existence of the particular

---

15      Other courts in this district court have found the President can waive an agency's *Glomar* response because he is the head of the executive branch. *See, e.g.*, *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 24 (D.D.C. 2018), *recons. denied in part*, 17-CV-00144, 2018 WL 3956426 (D.D.C. Aug. 16, 2018) ("The D.C. Circuit has recognized that '[a] disclosure made by the President, or by [an] advisor acting as instructed by the President,' is attributable to executive branch agencies for purposes of the official acknowledgement doctrine.") (internal quotation marks omitted), quoting *ACLU II*, 710 F.3d at 429 n.7; *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 57 (D.D.C. 2015) (noting that NSA rightfully concedes, based on case law, that the President's statement to the press and administration's white paper were attributable to the NSA), citing *ACLU II*, 710 F.3d at 429 n.7. In each of these cases, however, the court found that the President's statement had not waived the agency's *Glomar* response because the statement failed to meet the three criteria of the official disclosure test.

documents that would be responsive to the specific FOIA requests. Furthermore, his tweets merely commented on the news reporting regarding this issue, rather than information that only could be obtained from government records. Tweets that simply repeat what has been reported in the media cannot satisfy the strict test of official acknowledgment. *Afshar*, 702 F.2d at 1133 (same, regarding information reported in book by former CIA official); *Phillippi*, 655 F.2d at 1330–31. The law is clear that "[a]n agency's official acknowledgement of information by prior disclosure . . . cannot be based on mere public speculation, no matter how widespread." *Wolf*, 473 F.3d at 378. By acknowledging that the President was responding to a Fox and Friends broadcast, plaintiff concedes that the President was not responding to information he learned through government documents. As the D.C. Circuit has advised, "it is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so." *Fitzgibbon*, 911 F.2d at 765, quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975).

Thus, defendants' invocation of the *Glomar* responses were appropriate, and the Court will grant defendants' motion for summary judgment on this issue.

III. **The Court cannot find that the searches conducted by the FBI, NSA, and NSD were adequate, but the showing was sufficient with respect to the searches conducted by State, ODNI, and CIA.**

An agency's search for documents in response to a FOIA request is adequate if it is "beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011), quoting *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999); *see also Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). To demonstrate that it has

performed an adequate search, an agency must submit a reasonably detailed affidavit describing the search. *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). An affidavit is "reasonably detailed" if it "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials (if such records exist) were searched." *Id.*; *see also Defs. Of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009). Although there "is no requirement that an agency search every record system," an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68.

Agency affidavits attesting to a reasonable search "are accorded a presumption of good faith," *SafeCard Servs.*, 926 F.2d at 1200, that can be rebutted "with evidence that the agency's search was not made in good faith," *Trans Union LLC v. FTC*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001), or when a review of the record raises substantial doubt about the adequacy of the search effort. *Valencia–Lucena*, 180 F.3d at 326; *see also Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) ("If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper.").

An agency's declarations "need not 'set forth with meticulous documentation the details of an epic search for the requested records,'" *Defs. Of Wildlife*, 623 F. Supp. 2d at 91, quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982), but they should "describe what records were searched, by whom, and through what processes." *Id.*, quoting *Steinberg v. DOJ*, 23 F.3d 548, 552 (D.C. Cir. 1994). Agency affidavits that "do not denote which files were searched, or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requester] to challenge the procedures utilized" are insufficient to support summary judgment. *Weisberg v. DOJ*, 627 F.2d 365, 371 (D.C. Cir.

1980); *see also Steinberg*, 23 F.3d at 552 (stating that an agency affidavit must describe "what records were searched, by whom, and through what process"). Given these principles, conclusory assertions about the agency's thoroughness are insufficient. *Morley v. CIA*, 508 F.3d 1108, 1121 (D.C. Cir. 2007).

The affidavits submitted by FBI, NSA, and NSD left much to be desired. Thus, the Court finds that those agencies' searches were not adequate. ODNI, State, and CIA, on the other hand, conducted adequate searches.[16]

---

16     Plaintiff argues that he has identified a list of responsive documents which defendants have failed to produce, and therefore, this shows that defendants' searches were inadequate. Pl.'s Cross-Mot. at 32–40, citing Pl.'s Ex. A to Pl.'s Cross-Mot. [Dkt. # 25-1] ("List of Responsive Documents"). Upon close examination of that list, the Court finds that these "documents" fall within four categories, three of which do not undermine defendants' searches.

1.   Many of the items plaintiff identifies are not specific documents – rather, plaintiff lists documents that he assumes should exist without providing any support that they do in fact exist. *See, e.g.*, List of Responsive Documents at 2, #3 ("Any reports related to the policy change describe above . . . ."); *Id.* at 3, #15 ("Any reports or memoranda that reference, cite, quote, summarize, or discuss any of the aforementioned requests from Samantha Power."); *Id.* at 4, #24 ("Any reports that reference, cite, quote, or discuss the aforementioned request(s) of Mr. Trump, his associates, or any member of Congress."); *Id.* at 5, #35 ("All correspondence between individual Senators or Congressmen and any agency . . . ."). For example, #32 asks for all rules and regulations having to do with notifications of the dissemination of unmasked congressional identity information, but that assumes that policies and regulations about these notifications exist. *Id.* at 5, #32. Other items ask for reports regarding policy violations or incidents, but that assumes that these reports discussed policy violations related to unmasking. *Id.* at 3, #12 ("Each 'Annual Report on Violations of Law or Executive Order' submitted to ODNI" assumes that the violations of law had to do with unmasking); *Id.* at 3, #13 ("The NSD and ODNI's bimonthly reports of their review of the agencies' compliance with their minimization procedures" assumes that the reports contain incidents about unmasking); I*d.* at 5, #33 (requesting "[a]ll Notification of 'Possible Violations of Law'").

## A. FBI did not conduct an adequate search.

To conduct its search, the Records/Information Dissemination Section ("RIDS") of the FBI consulted with the Office of General Counsel, National Security and Cyber Law Branch ("NSCLB"). Hardy Decl. ¶ 83. NSCLB contains "the FBI's experts on national security law," and the group is tasked with, among other things, "providing legal advice regarding any issues concerning the FISA; coordinating with other offices in the FBI and DOJ to develop procedures for monitoring compliance with the FISA Standard Minimization Procedures ("SMPs");" and maintaining and updating minimization policy guides. *Id.* FBI concluded that based on the

---

2. Many of the items identified on this list fall within parts 2 and 3 of plaintiff's FOIA request, to which defendants asserted *Glomar* responses, and so they do not bear on the adequacy of the search conducted in response to parts 1 and 4. *See, e.g.*, *id.* at 4, #18 ("The unmasking request(s) sent by Rice to the FBI . . . ."); *Id.* at 4, #20 ("The intercepted communication(s) between Russian officials mentioned in a May 26, 2017 *Washington Post* article . . . discussing a conversation between Kushner and Sergey Kislyak."); *Id.* at 4, #23 ("The unmasking request(s) 'of Mr. Trump, his associates, or any member of Congress' that Mr. Clapper . . . testified that he submitted to at least one agency.").

3. Some of the claimed missing documents go beyond the scope of the requests in issue. For example, plaintiff includes on this list "[a]ll reports or documents referencing the possible existence and/or nature of 'exculpatory evidence' exonerating Papadopoulos or Page" *id.* at 5, #36, and "[a]ll documents concerning whether unmasking material was used to launch either the initial Russian counterintelligence/criminal investigations regarding the hacking of the DNC's Servers in the Summer 2016." *Id.* at 4, #37. Neither of these categories of documents fall within request 1 for policies, procedures, and reports regarding unmasking or violations of policies regarding unmaskings or request 4 for communications sent in response to any inquiry from the House Intelligence Committee. Compl. ¶ 33. Furthermore, two of the documents are material that ODNI may have in its possession but fall outside the FOIA request date range. *Id.* at 1, #4 (requesting the "2013 revision to E/S 00176"); *id.* at 3, #9 (requesting the Intelligence Community Directive 112, dated Nov. 16, 2011).

4. After eliminating the categories of documents above, out of forty-four, only ten remain. *Id.* at #5, #6–8, #39–44. The documents are materials that the FBI and NSA may have in their possession, but because the Court finds that the searches conducted by FBI and NSA were inadequate based upon the affidavits submitted, the Court need not discuss the existence of these documents as it relates to the adequacy of their searches.

FOIA request at issue, NSCLB "would be able to provide advice and guidance on what records would be responsive . . . and would be able to locate any such responsive records." *Id.* FBI asked NSCLB whether it had any records responsive to the FOIA request and provided the group with a copy of the FOIA request. *Id.* ¶ 84. In describing its search, FBI stated:

> Relying on its expertise regarding FBI policies regarding the collection and dissemination of intelligence information, NSCLB searched for FBI policy documents to locate any information related to FISA 'unmasking.' Based on its expertise and its search of FBI policy documents, NSCLB concluded that information about FBI policy and guidance on 'unmasking' was housed in the FISA and SMP Policy Guide, dated August 11, 2016.

*Id.* The FBI concluded from this that there were no additional locations where responsive documents might be located. *Id.* ¶ 85.

The supplemental FBI declaration states that the NSCLB "searched for any reports responsive to plaintiff's request" which included searching documents such as reports to the Intelligence Oversight Board or those located at the Directorate of Intelligence. Suppl. Hardy Decl. ¶ 12 [Dkt. # 26-4]. In a footnote, FBI explained further that its

> searches did not rely on specific search terms *per se.* Rather, relying on subject matter expertise, these employees identified the policy that governs this activity, retrieved the most recent version of the policy . . . and reviewed it to identify the portions actually responsive to the request based on the content of the actual document, rather than based on search terms.

Hardy Decl. ¶ 84 n.20. This is the extent of FBI's description of its search for documents.

The description of the search is too cursory to persuade the Court that the search was adequate. Although the declaration identifies the office to which the request was forwarded and why that office would be a likely location of the records sought, it fails to explain how the NSCLB conducted its search, what systems or files were searched, whether it searched any hard copy files or only electronic files, and why using search terms would not be effective. While an

agency's search need not be "meticulous," the agency should at least set forth who conducted the search, what records were searched and how the search was conducted. Further, while defendant detailed why the NSCLB would be an appropriate place to start, the affiant did not fully explain why no other components of the agency were consulted.

The FBI's description did not assure the Court that the search was reasonably calculated to uncover all relevant documents. Based on the record before it, the Court will deny defendant's motion for summary judgment on this basis and remand the case to the FBI to conduct an adequate search responsive to part 1 of plaintiff's FOIA request.

### B. NSA did not conduct an adequate search.

NSA's FOIA office identified the "Mission Engagement, Requirements and Assessments" organization, which includes the "Information Sharing and Collaboration" group as well as the "Information Sharing Execution and Dissemination & Guidance Services," as the most likely units to possess responsive materials because these organizations orchestrate and implement NSA's policies and procedures related to unmasking and handle all information sharing requests and releases. Thompson Decl. ¶¶ 31–32. NSA also "consulted with other organizations that may maintain responsive records as identified by NSA's Information Sharing and Collaboration organization," such as the Office of the Director. *Id.* ¶ 31. These organizations conducted a search for information responsive to the first part of plaintiff's FOIA request within the time period specified. *Id.* As to how the search was conducted, the declaration stated:

> These personnel were fully aware of and familiar with the nature of NSA systems that would maintain possibly relevant documents and relied on their experience at NSA to identify the relevant repositories containing potentially responsive materials. Ultimately, these personnel reviewed [p]laintiff's verbatim request . . . and identified the known universe of

> policy documents that relate to United States persons identities, including
> those policies, procedures, and guidance that govern unmasking requests.

*Id.* NSA further stated that "[t]he search methods utilized," such as "its use of senior personnel most familiar with unmasking processes and implementation" within the identified organizations, were appropriate because documents responsive to the request most likely reside there. *Id.* ¶ 33.

This description of the agency's search does not assure the Court that the search was reasonably calculated to uncover responsive documents. The declaration does not detail what files or repositories were searched, whether hard copy or physical documents were searched, and through what processes the documents were searched. Thus, the Court will deny defendants' motion for summary judgment and remand the case to NSA to conduct an adequate search responsive to part 1 of plaintiff's FOIA request.

### C. NSD did not conduct an adequate search.

NSD's FOIA office determined that the Office of Intelligence ("OI") would be the NSD subcomponent most likely to maintain records responsive to parts 1 and 4 of the FOIA request, because OI represents "elements of the Intelligence Community, including the FBI, before the Foreign Intelligence Surveillance Court to obtain authorization pursuant to FISA for those elements to conduct certain intelligence operations," and OI "maintains oversight authority" over those intelligence operations. Findlay Decl. ¶ 20 n.10. Since plaintiff's request pertained to "electronic surveillance conducted under FISA," NSD determined that OI would be the most logical place to find responsive documents. *Id.* ¶ 20.

With regard to how the search was conducted, NSD merely states:

> OI personnel confirmed, based on familiarity with the types of records at
> issue in this matter, that OI does not maintain any "policies, procedures,
> and reports involving the process for unmasking, or requesting

> unmasking," as requested in item 1, from the time period noted in the request. Likewise, OI personnel confirmed that OI has no records of "any materials sent in response to any inquiry from the House Intelligence Committee regarding unmasking," as requested in item 4, from the time period noted in the request.

*Id.* ¶ 21. But, the declarant did not attest to whether OI completed a search, or did not have any documents related to, the last part of part 1 of plaintiff's FOIA request – "reports on any incidents of policy violations." NSD FOIA Request.

NSD further confirmed that it did not have records responsive to plaintiff's fourth request for documents, which asked for copies of any materials sent in response to any inquiry from the House Intelligence Committee or other congressional committees regarding unmasking from January 1, 2017 to August 11, 2017. NSD noted that it is the Department's Office of Legislative Affairs ("OLA") that is responsible for communicating with Congress. *Id.* ¶ 21 n.12. NSD's affiant stated, "I would expect that any material provided as a response to a congressional inquiry would be provided to Congress through OLA." *Id.* But, NSD did not search OLA, reasoning that "if there are copies of anything provided by OLA to Congress in NSD records, OI or [Office of the Assistant Attorney General ("OAAG")] would be the natural place for them to be kept." *Id.*

NSD also conducted electronic records searches within the Office of the Assistant Attorney General ("OAAG"). *Id.* ¶ 22. OAAG's "document tracking system" was searched using the terms "unmask" and "upstream," but the searches did not yield any results. Finally, NSD also conferred with its Office and Law and Policy, which confirmed that it did not maintain any records responsive to the request. *Id.* ¶ 23.

Here again, the agency fully explained why certain components were searched but it gave no grounds for why no other components were involved. Also, NSD did not conduct an

adequate search because it did not search all systems that could have responsive materials. NSD acknowledged that OLA is responsible for congressional communications but did not search OLA or confirm that OLA would not have any other records besides those already found in the OI or OAAG systems. Furthermore, NSD did not confirm that it searched for or identified locations for last part of item 1 of plaintiff's FOIA request, which asked for reports on incidents or policy violations. And, while in some cases, a search for records has been found unnecessary when it was supported by an agency attestation that a person familiar with the records maintained by the agency had determined that no responsive records were, in fact, maintained, typically the declarant explains why such data is not maintained or why a more comprehensive search would be futile. *See American-Arab Anti-Discrimination Comm. v. DHS*, 516 F. Supp. 2d 83, 87–88 (D.D.C. 2007) (finding sufficient agency's statement that it "does not maintain [requested] information" and ruling search "unnecessary" since affiant spoke to several ICE agents and as "Deputy Assistant Secretary for Operations, . . . [was] presumed able to familiarize himself with what statistics ICE does and does not maintain"). NSD's declarant made no such statements here.

Thus, the Court will deny defendants' motion for summary judgment and remand the case to NSD to conduct an adequate search responsive to parts 1 and 4 of plaintiff's FOIA request.

### D. ODNI conducted an adequate search.

When ODNI received plaintiff's FOIA request, it identified all relevant records custodians who are likely to have responsive records to parts 1 and 4 of plaintiff's request. Gaviria Decl. ¶ 14. The affiant explained that ODNI does not have one repository of documents where search terms can be entered and all responsive can be recovered; rather, individual

components of ODNI maintain records.  *Id.*  ODNI identified three components that could have responsive records:  The Office of Civil Liberties, Privacy and Transparency ("CLPT"); the Office of Legislative Affairs; and the ODNI Executive Secretariat.  *Id.*

The CLPT was chosen because it determines how information should be made publicly available while balancing the need to protect classified information when disclosure can harm national security.  *Id.* ¶ 15.  CLPT searched its classified shared drive and email accounts for potentially responsive records, using the base term "mask" (which would yield results such with terms like "unmask," "unmasking," and "unmasked").  *Id.*

The Office of Legislative Affairs acts as the principal interface between ODNI and Congress, relevant to part 4 of plaintiff's request.  *Id.* ¶ 16.  This Office searched for responsive records within a folder on its classified shared drive, where OLA saves all records related to unmasking.  *Id.*

The Executive Secretariat of ODNI is the central point of contact for the Director of National Intelligence ("DNI") and personnel associated with the DNI.  *Id.* ¶ 17.  The files maintained by the Executive Secretariat "preserve institutional history and archive organizational functions, policies, decisions, procedures, and operations."  *Id.*  This group was deemed unlikely to have responsive records, but it was searched anyway.  The Executive Secretariat searched its classified emails and shared drive using the terms "mask," "unmask," and "umasking."  *Id.*

The Court finds that this search was adequate because the declaration set forth that the groups likely to contain responsive materials were identified and searched, which systems were searched, and the process that was utilized.  Thus, the Court will grant defendants' motion for summary judgment as to the adequacy of ODNI's search.

### E. State conducted an adequate search.

When the Office of Information Programs and Services ("IPS") section of the State Department receives a FOIA request, it first determines "which offices, overseas posts, or other records systems within the Department may reasonably be expected to contain the records requested." Stein Decl. ¶ 8. IPS determined that the components most likely to contain responsive records were the State Archiving System, Bureau of Intelligence and Research, and the Office of the Legal Adviser. *Id.* ¶ 10. IPS then relies on employees within these components to determine files and locations to search to find responsive records. *Id.* ¶ 11.

The State Archiving System is an interface that consists of over forty million records, including documents such as diplomatic notes, correspondences between members of Congress and other agencies, position papers and reports, among other things. *Id.* ¶ 12. A State Department analyst conducted four searches. Declaration of Susan C. Weetman [Dkt. # 26-7] ("Weetman Decl.") ¶ 4. First, the analyst searched using the term "unmask" (which would capture variations of the word), but this resulted in many documents that used the word as a synonym for revelation or in a way that did not refer to the process at issue. *Id.* "Therefore, State determined that the search terms needed to be modified in order to pinpoint records that were more likely to be responsive." *Id.* A search of "unmask AND FISA" yielded thirty-one documents, none of which were responsive. *Id.* A search of "unmask OR FISA," OR "Foreign Intelligence Surveillance Act" returned thousands of hits; the department reviewed a sampling of documents and none were responsive. Stein Decl. ¶ 13. Many of these search hits "were routine warnings that a document may contain FISA-derived information." Weetman Decl. ¶ 4. The last search State conducted was "unmask" /1 ("policy" OR "procedure" OR "report"), which yielded

six hits.  *Id.*  The records that resulted were each reviewed for responsiveness, and it was determined that none were responsive.  *Id.* ¶ 5; Stein Decl. ¶ 14.

The Bureau of Intelligence and Research's ("INR") mission is to "harness intelligence to serve U.S. diplomacy."  Stein Decl. ¶ 15.  "INR provides independent analysis of events to Department policymakers; ensures that intelligence activities support foreign policy and national security purposes; and serves as the focal point in the Department for ensuring policy review of sensitive counterintelligence and law enforcement activities around the world."  *Id.*  INR maintains both electronic and hard copy working files that relate to discrete issues.  *Id.* ¶ 16.  The "electronic files consist of classified and unclassified email records and databases that contain classified" information.  *Id.*  INR determined that the custodians likely to contain responsive documents were the Office of Intelligence Operations and Oversight, which ensures foreign policy oversight of intelligence operations, and Special Assistants, which helps to manage information flow to the entire Bureau.  *Id.* ¶ 17.  The Director and an Office Assistant for the Office of Intelligence Operations conducted a search of their classified and unclassified email records using the search term "unmasking."  *Id.* ¶¶ 18–19.  A current Special Assistant searched the Special Assistant email accounts and shared folders on the classified and unclassified systems.  *Id.* ¶ 21.  He used the terms "unmask," "ident," and "identity request" to conduct his search.  *Id.*  A back-up Special Assistant also searched his email accounts using the same search terms.  *Id.* ¶ 22.  None of the searches were limited by date.  *Id.* ¶¶ 18–22.  The records located from these searches were reviewed for responsiveness.  *Id.* ¶ 24.

The Office of the Legal Adviser furnishes legal advice on issues arising in the course of the Department's work.  *Id.* ¶ 25.  An individual knowledgeable about the FOIA request and the Legal Adviser's records system identified the Office of Law Enforcement and Intelligence as the

component most likely to have responsive documents, because this office advises the United States on intelligence activities. *Id.* ¶ 25. The Attorney Adviser who provides such advice conducted a search of her unclassified and classified email records using the terms "unmask OR 'Ident request,'" limited to the date range that plaintiff provided. *Id.* ¶ 27. She conducted a search of unclassified and classified records belonging to her predecessor using the search terms "unmask OR 'ident request.'" *Id.* ¶ 28. She also manually reviewed her predecessor's paper records and all electronic folder titles. *Id.* Based on the folder title, she would then review the contents of the folder. *Id.* In the course of this search, no responsive records were found. *Id.* ¶ 29.

Plaintiff argues that the State Department's search was inadequate because it failed to search "several key offices likely to have responsive documents." Pl.'s Cross-Mot. at 38. Plaintiff then identifies one office that should have been searched – the Office of the U.N. Ambassador – since there was widespread news coverage concerning Ambassador Power's repeated requests for unmaskings. *Id.* But, part 1 of plaintiff's FOIA request did not ask for documents related to requests for unmaskings – rather, it asked for "[a]ll policies, procedures, and reports involving the process for unmasking, or requesting unmasking, including reports on any incidents of policy violations, from January 1, 2015 to February 1, 2017." State FOIA Request. It was reasonable for the State Department to limit its search to those offices that would be responsible for or involved in developing such policies, procedures, or reports – plaintiff does not contend that the Office of the U.N. Ambassador is responsible for creating these policies.

Plaintiff also takes issue with State's sampling of documents to determine responsiveness and its search terms. Pl.'s Reply at 18–19. Specifically, State conducted two very broad

searches – first, it searched the term "unmask"; second, it searched "unmask OR FISA OR 'Foreign Intelligence Surveillance Act'" – each of which yielded thousands of documents.[17] Weetman Decl. ¶ 4. State then reviewed a sample of these documents and concluded that the search terms were too broad, since the review did not contain responsive records. *Id.* Plaintiff contends that State should have reviewed every document that resulted from these search terms. Pl.'s Reply at 18. But it was not unreasonable to review a sample of documents unearthed with the use of a broad term to determine whether the search needed to be more targeted. Plaintiff also argues that the more targeted search terms were unduly restrictive. *Id.* Specifically, plaintiff argues that searching "unmask" with "FISA" was not warranted. *Id.* But, State did not only search "unmask" with "FISA," it also searched "unmask" with "policy, procedure, or report." Weetman Decl. ¶ 4. These search terms were reasonably calculated to uncover responsive documents to part 1 of plaintiff's request, and every document that resulted from the narrower searches was reviewed for responsiveness.

The Court finds that this search was adequate because it set forth, in reasonable detail, the groups identified to have responsive documents and the search methods and processes used. Thus, the Court will grant defendants' motion for summary judgment as to the adequacy of the State Department's search.

### F. CIA conducted an adequate search.

To conduct its search, CIA identified which offices within the CIA would likely have responsive material. Shiner Decl. ¶ 14. Because the scope of the request was narrow, "the CIA

---

17      In plaintiff's cross-motion, he argues that State should have run the term "unmask" alone. Pl.'s Cross-Mot. at 40. In support of its opposition, State submitted a supplemental declaration, averring that it did run that search term alone, but it yielded thousands of documents. Plaintiff contends that this is a "fabrication," but does not offer any reason why that would be the case. Pl.'s Reply at 18.

identified the Office of Privacy and Civil Liberties, the Office of the Inspector General, the FISA Program Office, the Office of Congressional Affairs, and the Office of General Counsel, as offices that would maintain any potentially responsive information." *Id.* CIA explained that the Office of Privacy and Civil Liberties was chosen because "it periodically reviews CIA actions, policies, procedures, and guidelines to ensure the Agency is adequately considering privacy and civil liberties in its activities." *Id.* The Office of Inspector General investigates claims of waste, fraud and abuse within the CIA. *Id.* "The FISA Program Office oversees the CIA's FISA program and maintains policies, procedures, and statistics related to . . . dissemination" of data acquired under FISA, including the unmasking of information. *Id.* Part of the Office of Congressional Affairs' mission is "to ensure that Congress is kept informed of intelligence issues and activities." *Id.* Finally, the Office of General Counsel was selected because it handles the legal affairs of the CIA which may implicate the records plaintiff sought. *Id.*

The CIA worked with officers from these respective divisions to conduct a physical and electronic search, using the broad search term "unmasking" and "Section 702 minimization procedures" and variations of these terms, limited to the time frame specified. *Id.* ¶ 16. They searched "emails of certain custodians who were identified as subject matter experts, internal share drives, relevant databases and paper file holdings, and the Agency system which contains publicly disclosed records." *Id.* ¶ 15.

The Court finds that CIA's affidavit is reasonably specific because it details the locations searched, who conducted the search, and the search processes. The CIA conducted an adequate search that was reasonably calculated to uncover all relevant documents. Thus, the Court will grant defendants' motion for summary judgment as to the adequacy of CIA's search.

## CONCLUSION

For the foregoing reasons, defendants' motion is granted as to the *Glomar* responses they asserted pursuant to FOIA Exemptions 1 and 3 to parts 2 and 3 of plaintiff's FOIA requests and NSA's *Glomar* response to part 4 of the FOIA request. The motion is also granted with regard to the adequacy of the searches conducted by ODNI, State, and CIA. However, defendants' motion is denied, and plaintiff's motion is granted, as to the adequacy of the searches conducted by FBI, NSA, and NSD. The Court will remand the case to these agencies, and they are instructed to conduct further searches for records responsive to parts 1 and 4 of the FOIA requests in accordance with this opinion, and to release any reasonably segregable non-exempt material to plaintiff consistent with FOIA.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: January 28, 2020